*812 OPINION.
Upper:
An analysis of the contract by which decedent “sold” this stock to her children creates grave doubt whether it was of any real effect in advance of decedent’s death. Internal Revenue Code, sec. 811 (c). Endorsement and return of the stock as “security” was called for at once, all voting rights were retained during decedent’s life, and the “vendees” were forbidden “to sell, assign, mortgage, pledge, hypothecate or in any manner dispose of any of said stock,” until after her death and that of her husband. It is even stipulated in express language “that upon the death of both said Frank P. Holland and Mrs. Pamelia D. Holland [decedent] * * * the *813 title of said Vendees to said stock evidenced by their said certificates respectively shall become absolute,” and that “all of the provisions of this contract are to be and always construed to be conditions precedent to the right and title of Vendees * *
Petitioner refers to a statute of the state of domicile, Texas, which voids as to creditors and bona fide purchasers reservations of title retained to secure the purchase price, Texas Revised Civil Statutes, art. 5489, and to Harling v. Creech, 31 S. W. 357; 88 Texas 300, which seems to hold that such an arrangement is to be construed as no more than a chattel mortgage even as between the parties. The contention is that consequently “The conditions imposed on the sale and the reservations of title, if any, in the contract were absolutely void even as between the parties * * In other words, petitioner asks us to disregard the plain language of the contract and the obvious intention of the participants on the ground that they purported to accomplish a postponed transfer which the law of Texas forbids, and hence that the Federal estate tax which would apply if the contract meant what it says is frustrated by local law. This would be a process of reasoning not without difficulty. See Lyeth v. Hoey, 305 U. S. 188. We should rather incline to the view expressed by a Federal court sitting in Texas:
* * ⅜ the law covering this tax is based upon “the intention of the grantor” ⅜ * *. In the case at bar the property was delivered to the grantees but contemporaneously therewith they passed and delivered it * * * in pledge * * *. The Court * * * finds that the several transfers, though not made in contemplation of death, resulted in decedent still holding, during her lifetime * * * the personal estate which she had contemporaneously passed to her children * * *. In substance, the transfers, though in form legal and serving to accomplish their purpose as transfers, could not thereby defeat the tax obligation ⅜ ⅜ *. [Tips v. Bass (Dist Ct., W. Dist. Texas), 21 Fed. (2d) 460.]
But, however that may be, there is a further aspect of the transaction which we regard as controlling. In addition to all that has already been detailed, the contract reserved a payment of $25,000 a year to decedent’s husband as long as he lived and thereafter to decedent. Even if there was an outright transfer of the title, we see no escape from this reservation of the income for life or from the consequent necessity of including the property in the estate, under the principle of Helvering v. Hallock, 309 U. S. 106; Estate of Mary H. Hughes, 44 B. T. A. 1196.
True, this payment was denominated “salary” and was not specified as company profits or dividends on the shares. But no services were or could be required in exchange. And at petitioner’s request, we have found the value of the company’s capital and surplus at that time to have been $125,000. The annual payment would thus approximate a return of 20 percent on the investment. In the absence *814 of evidence of prior earnings in excess of that figure, and there is none, we can not regard it as reasonable that the parties would expect the property to produce a higher average return. This was presumably income of the marital community before the husband’s death, and belonged to decedent alone thereafter. The parties raise no question of decedent’s continuing interest in this income on the strength of the community property aspect. Hence, without yielding completely to terminology, and viewing the transaction in its essential reality, the income to be expected from the stock was in effect retained by decedent during her life. As the Board said in Mary H. Hughes, supra (p. 1200) :
* * ⅜ If [decedent] * * * had in 1928 given $945,000 to the children, or someone representing them, and had taken their promise not to use it during her lifetime except to pay her $31,500 a year until she died, this would certainly have been a gift to take effect in possession or enjoyment at or after her death, even though ownership of the fund vested in the children at once ⅜ * *.
We take the same view of the present transaction.
Certainly, on an inclusive view of the whole arrangement, this withholding of the income until decedent’s death, coupled with the retention of the certificates under the pledge and the reservation of the right to vote the stock and to designate the company officers, is an illuminating instance of the futility of that inquiry into “the technical forms in which interests contingent upon death are cast” which the Hallock case renounces. The very injection, into the discussion, of the nature of the title under the law of the domicile, and of the extent to which the contingencies of the transfer were the conditions precedent of a conditional sale or the conditions subsequent of a chattel mortgage, are reminiscent of the “unwitty diversities of the law of property” represented by the St. Louis Union Trust Co. cases, 296 U. S. 39, 48, but challenged by Helvering v. Hallock. We can not reach our conclusion in reliance upon any such “gossamer distinctions” and accordingly find no error in respondent’s inclusion of the stock in decedent’s estate.
We agree with petitioner, however, that the valuation placed upon , the stock as of the date of death was too high. Book value of cor-i jporate assets must be qualified by their earning capacity. It can ' not be assumed that the figure employed is a liquidating value, and if the appraisal is based upon worth as a going concern it is obvious that anticipated earnings are a controlling factor. See Elverson Corporation, 40 B. T. A. 615; affd. (C. C. A., 2d Cir.), 122 Fed. (2d) 295.
As we have recognized in discussing the basic issue, salary paid to decedent and her husband for services of a negligible value was in *815 effect an element of corporate profits, and we think may appropriately be considered as such in analyzing the earnings of the business. By adding these amounts to the profit and loss figures in the company’s accounts, we find that total earnings for the five years preceding decedent’s death were in the neighborhood of $35,000, or an average of $7,000 a year. But the profits were unstable and fluctuated violently, indicating they were far from assured, with both the figures and the testimony justifying the anticipation of a downward trend. Taking all the factors into account, we have accordingly found a value per share of $125.
The remaining issue relating to the value of certain real property in the estate known as Hollandale Farm has now been abandoned by petitioner and need not be further noticed.

Decision will he entered vmder Bule 50.