HILL'S ESTATE et al. v. MALONEY, Collector of Internal Revenue (two cases).

Nos. C–1762, C–2496.

District Court, D. New Jersey.

Nov. 16, 1944.

William A. Moore, of Trenton, N. J., and Sanford D. Beecher and William H. Huplits, Jr., both of Philadelphia, Pa., for plaintiffs.

Thorn Lord, U. S. Atty., of Trenton, N. J., by Charles D. Hyman, Asst. U. S. Atty., of Atlantic City, N. J., and Lester L. Gibson, Sp. Asst. to Atty. Gen., for defendant.

FORMAN, District Judge.

The estate of C. V. Hill and its executors, J. Stuart Hill and C. V. Hill, Jr., claim refunds of federal income tax paid by the late C. V. Hill during his lifetime for the calendar years 1935 and 1936, in two separate actions brought against the Collector of Internal Revenue. Both actions were tried together before this Court and have the same bases in fact. The amounts involved differ because one action represents a claim of refund for the year 1935 and the other for the year 1936.

C. V. Hill, a resident of Trenton, New Jersey, now deceased, was born on October 10, 1863. During his lifetime he regularly reported his income for federal income tax purposes on a cash basis. He paid such tax in the amount of $9,513.04 for the year 1935 and in the amount of $10,487.43 for the year 1936. Plaintiffs received a notice of a deficiency of income tax for these years under date of May 29, 1939, in the amounts of $384.14 and $2,014.47, respectively. These deficiencies were paid by plaintiffs. Claims for refund of tax for 1935 and 1936 were disallowed by the Commissioner of Internal Revenue on September 12, 1939, and November 19, 1940, respectively.

On August 31, 1935, C. V. Hill agreed with a syndicate composed of five individuals to sell 900 shares of the common stock of C. V. Hill & Co., Inc., upon condition that the determination of the fair sale value of the stock be submitted to a neutral and independent appraiser agreeable to both parties. Upon a written submission of such value by the appraiser, the syndicate was to have the option of purchasing the entire amount of stock for cash upon the basis of the value determined by the appraiser within thirty days thereafter. The syndicate consisted of J. Stuart Hill and C. V. Hill, Jr., sons of C. V. Hill, and

three others, all five of whom were employees of the company.

On December 9, 1935, the syndicate was formally organized by virtue of an agreement entered into by these five persons, whereby the sons of C. V. Hill were designated the syndicate managers. It was proposed therein that 450 shares of stock should be purchased, allocable to the syndicate members as follows:

| | |
|---|---|
| J. Stuart Hill | 175 shares |
| C. V. Hill, Jr. | 175 shares |
| J. Tinley Knotts | 45 shares |
| Earl J. Kressler | 40 shares |
| Frank D. MacMaster | 15 shares |

In addition to setting forth the terms upon which the members' entered the agreement and their obligations thereunder, it provided that the purpose of the formation of the syndicate was to acquire the said stock for which it would be bound to pay the same benefits to C. V. Hill as he would derive from the investment in a non-refundable annuity contract for life of an amount which would be the equivalent of the value of the stock. No mention was made of the balance of 450 shares, but it is known that they were purchased as shown below and it is assumed that they were allocated to the syndicate members in similar proportion.

Under a contract dated December 11, 1935, C. V. Hill sold to the syndicate 450 shares of the stock with a ninety-day option to purchase the remaining 450 shares. The contract set forth that a determination of the fair sale value of the 900 shares had been made by a disinterested, neutral and independent appraiser and that his determination was agreeable to both parties. It stated that the value of the stock was determined to be $360,000, or $400 per share, and that amount was the consideration which was to be paid to C. V. Hill in the same manner as if he had invested that sum in a non-refundable life annuity contract. C. V. Hill, under this contract, was to receive the sum of $27,000 in cash and $1,514.70 per month for the balance of his life commencing January 31, 1936, and upon the exercise of the option by the syndicate he was to receive an additional $18,000 as a down payment and an annual payment of $20,444.40 for life commencing January 31, 1937. The option was exercised by the syndicate and a contract was entered into between the parties on January 6, 1936, for the purchase by the syndicate of the balance of the stock amounting to 450 shares upon the terms set forth in the December 11, 1935 contract.

C. V. Hill, being 72 years of age at the time of these agreements, had a life expectancy based on mortality tables of approximately 8 years. He died on February 4, 1939, at which time he had received under the contracts the total sum of $162,377.10.

Prior to the execution of the aforesaid agreements, C. V. Hill was president and a director of C. V. Hill & Co., Inc., and his sons, J. Stuart Hill and C. V. Hill, Jr., were general manager and sales manager, respectively. Immediately upon the execution of the agreement dated December 11, 1935, C. V. Hill resigned as president and as a director of the company and thereafter the syndicate members elected themselves directors. J. Stuart Hill and C. V. Hill, Jr., were named as president and vice president, respectively. C. V. Hill no longer participated in the management of the company. The shares of stock acquired by the syndicate together with shares owned by them individually enabled the syndicate to enjoy a majority interest in the company. Upon taking over the business, the syndicate increased the salaries of its members and voted themselves large bonuses. Comparative figures for the years 1934 to 1936, inclusive, of the incomes received by each of the sons, who owned the greater part of the stock and were the dominant members of the syndicate, follow:

| | 1934 | 1935 | 1936 |
|---|---|---|---|
| Salary | $ 6,075.00 | $ 7,425.00 | $24,250.00 |
| Bonus | 4,000.00 | 16,000.00 | 40,000.00 |
| Total | $10,075.00 | $23,425.00 | $64,250.00 |

C. V. Hill reported his 1935 income as if he had sold 450 shares of stock for cash or its equivalent. He treated the transfer as a closed and completed transaction for the sale of 450 shares of stock for $180,000, reporting a total capital gain of $157,500 on this item. This figure resulted from his use of the par value of the stock, $50 per share, as a cost basis to him, making his total cost the sum of $22,500. His 1936 income tax return was similarly computed on this basis and therefore in each of these years he included $157,500 in capital gain and paid the tax thereon. An audit of these returns by the defendant terminated in an adjustment of the cost

basis of the stock to C. V. Hill from $50 per share to $43 per share, which was the basis for the deficiencies subsequently paid by the plaintiffs herein. A portion of the 1936 deficiency arose by reason of the alleged failure of C. V. Hill to include as income the sum of $4,590, which defendant claimed represented taxable annuity income as provided for by the Revenue Act of 1936. 26 U.S.C.A.Int.Rev. Code, § 22(b) (2).

Before instituting this suit, plaintiffs filed claims for refund of tax for the years 1935 and 1936 upon the theory that gain was only realized on the transaction upon actual receipt of payments as made from time to time. These claims were rejected by defendant who at that time took the position that the transfers of the stock were sales for cash or its equivalent and properly treated as such, i.e., closed transactions as if for cash. On their theory, plaintiffs compute C. V. Hill's income tax for the year 1935 to be approximately $118.92,[1] after reflecting, among other things, the actual receipt by him of $27,000, the down payment on his contract of December 11, 1935, received during that year, and his income tax for the year 1936 to be approximately $698.28,[1] based upon the actual receipt by C. V. Hill during that year of $36,176.40.

Therefore, plaintiffs seek in this action the recovery of $9,778.26 and $11,803.62, representing refunds of tax for the years 1935 and 1936, respectively.

Defendant now takes the position in his amended answer that the sale of the 900 shares of stock was not a bona fide sale of stock, but a gift of the same to the syndicate, with a reservation of the income therefrom for life. Under this theory defendant argues that C. V. Hill reserved to himself a life interest in the stock and therefore the transacation was not taxable as a closed transaction of a sale of stock for cash or its equivalent, but that the payments received in 1935 and 1936 should have been treated as ordinary income and so taxable. Defendant computed the correct liability of C. V. Hill for tax in 1935 as $3,959.53 and in 1936 as $7,050.14, and he conceded overpayment of tax in the

amounts of $5,937.65 and $5,451.76 for those years, respectively. Pursuant to his altered position, defendant continues to include in his computation of C. V. Hill's gross income for the year 1936, the sum of $4,590 as taxable annuity income, which he argues he is entitled to do under Sec. 22 (b) (2) of the Revenue Act of 1936, supra. The price of the stock under the contract of December 11, 1935, was $180,000. That contract provided for a down payment of $27,000. The balance of $153,000 represented the cost of the annuity to C. V. Hill. Upon the latter amount defendant calculated 3% or $4,590.

In support of his contention that the transfer of the stock was not a bona fide sale but rather a gift of the stock to the syndicate with a reservation of the income therefrom for life, defendant argues that C. V. Hill and the syndicate anticipated that the earnings of C. V. Hill & Co., Inc., available for distribution, and the dividends on the shares of stock, would adequately cover the payments to be made to C. V. Hill under the agreements and that it was in fact these same funds of the company that were used to meet the payments. Defendant points to the earnings of the company, which were in excess of the proposed payments during the prior years and also during the years subsequent to the agreement, and to the increased salaries of the members of the syndicate immediately following the agreements, to show that the transaction was not intended as a sale of stock, but as a gift of the stock with the reservation that C. V. Hill was to receive a stipulated return from the business for the remainder of his life. Defendant further argues that the proof bears out that the agreements were not such as would be engaged in by C. V. Hill as a sound business venture, but rather only as an arrangement by a father desiring to turn over his business to his sons at the lowest taxable cost. He emphasizes the fact that, although the annuity C. V. Hill received was not refundable, the payments to be made thereunder were not secured in any way other than by the mere promise of the syndicate to carry out its terms and that it was dependent upon the continued suc-

---

[1] The figures used here, taken from the pleadings, do not correspond with the computations made by plaintiffs in their brief and are not intended to be more than an approximation.

There also appears to be a discrepancy in the complaint in Civil Action No. 1762 between the amount which plaintiffs claim should have been paid by C. V. Hill in 1935 and the amount sought to be recovered as an overpayment of taxes for that year in relation to the amount actually paid as stipulated between the parties.

cess of the business. In effect, defendant contends that this was "a father and son transaction," one that C. V. Hill would not have made with strangers, and a means by which the father relieved himself of the cares of the business while he turned it over to those whom he most wanted to enjoy its future benefits and who would ultimately have received it in any event. He further contends that C. V. Hill was cognizant of the poor state of his health and that he would not live throughout his life expectancy of approximately eight years. Defendant submits that with such consideration in mind it must follow that C. V. Hill would not have entered into such a transaction with a stranger.

Plaintiffs offered testimony to show that the sons managed the business many years prior to the aforesaid agreements because their father was interested in other ventures and failed to take an active part in running the business, and that its success was due mainly to their efforts. They contend that the sons were inadequately compensated for their work and that this gave rise to the desire of the sons to purchase the shares of stock which would enable them to control the company and to derive the financial benefits of their past and future labors. Defendant refutes this contention by arguing that the compensation of the sons prior to 1935 was adequate and consistent with their position in the firm. He points to gifts of stock made to the sons upon two occasions [2] to show that the feelings of the father toward his sons were natural and considerate and that he was interested in seeing that they were adequately compensated for their work.

The fact is that any dividends paid on stock were negligible in amount and until the control of the stock came into the hands of the sons of C. V. Hill their compensation was not drastically increased. Obviously, unless they could control the stock, ownership of less quantity in their hands brought them no benefits beyond dry ownership and a return of but nominal dividends.

The evidence submitted by defendant relating to the intent of C. V. Hill when he entered into the agreements with the syndicate and to circumstances concerning the conduct of the business prior to the agreements is far from persuasive, and, standing alone, is insufficient to substantiate his position in those respects. The form and character of the agreements to sell the stock appear to be bona fide on their face and do not of themselves give rise to any suspicions that the intent of C. V. Hill was to bestow a gift.

The financial statements of the company prior to and up to the date of the agreements do reflect that the earnings of the company available for distribution were substantial and should, under ordinary circumstances, be such that they would more than adequately cover the payments to be made to C. V. Hill in the future under the agreements. The salary increases of the syndicate members were in fact intended to enable them to make such payments. There can be no doubt that the funds for these payments came from the income produced from the operations of the company, which income was paid to the individual members of the syndicate in the form of salary and bonus. In fact, the sons concede that the reason they entered into the contracts was because they had no other means with which to purchase their father's shares. These facts alone, however, are not sufficient proof of lack of bona fides of the agreements and do not lay the basis for the inference that a gift of the shares of stock was intended by C. V. Hill.

Defendant at the trial conceded that for the purpose of this case the shares of stock had a fair market value of $400 per share, and no more, on December 11, 1935, and January 6, 1936, the dates of the agreements to sell the shares. Plaintiffs offered to support the valuation by the introduction of testimony. Because defendant conceded the value for the purpose of this case, his objection to further testimony was sustained.

It is essential that the element of gift be shown for defendant to sustain his contention that the transaction was not a bona fide agreement between the parties to purchase the shares of stock. No issue is raised for determination as to the adequacy of the valuation of the stock at $400 per share ($360,000 for 900 shares), at the time of the execution of the contracts, for that value is conceded by defendant for the purpose of this case. There is no dis-

---

[2] 300 shares to each son in 1928; 28 shares to J. Stuart Hill on December 24, 1938;

38 shares to C. V. Hill, Jr., on December 24, 1938.

pute that the cost of non-refundable annuity contracts of the terms such as those given to C. V. Hill by the syndicate would amount to $315,000, if purchased from an insurance company by him. There was always the possibility that C. V. Hill might survive his life expectancy as calculated according to the mortality tables, in which event he stood to gain nearly $40,000 for each such year of survivorship. No proofs sustain any charge that his health in December of 1935 and in January of 1936 was such that he would be rated a poor risk by an insurance company if it was asked to consider him for such annuity contracts.

At the time these contracts were made, although C. V. Hill exhibited little interest in the business of the C. V. Hill & Co., Inc., leaving it almost completely in the hands of its management, he was not inactive in the business field. He did not manifest symptoms of waiting for death to knock at his door. Quite to the contrary, he engaged actively in business pursuits. He was a director of the Broad Street National Bank and actively in charge of its appraisal of real estate, a banking matter of no little consequence in those trying days. The evidence discloses close application by him to the work of the Bank in 1935, 1936, 1937, and 1938. This activity was sustained and not interrupted by unusual lapses. Of course, he suffered ills which are to be expected in a man past seventy, but there is no evidence that indicates that they were of such permanently incapacitating character as to alarm him to the point that he would anticipate that his death was imminent. There is no evidence that he was troubled by cancer of the stomach, the ailment which actually caused his death some four years after the execution of the contracts, much less that he knew at that time that he would not survive his life expectancy.

The question, therefore, as to whether C. V. Hill would have entered into such agreements with strangers is not a serious one. If the consideration for the sale of the shares was inadequate, the relationship of the parties together with attendant circumstances might very well have led to the conclusions that a gift was intended with the income therefrom reserved to the donor for life, and that these agreements would never have been made with strangers. It is reasonable to believe that C. V. Hill would take only the promise of those in whom he had confidence, for as defendant points out, the promise to pay the annuity payments was unsecured and dependent for the most part upon the continued successful operation of the business, and also, although to a lesser degree, upon the financial security of the promisees. Transactions, such as these, between members of the same family do not differ from the same transactions between strangers, except that in the former cases they must be carefully scrutinized.

Here no evidence offered by defendant, other than the close relationship of the parties, rises to the level of proof that a gift was intended, and that is insufficient to overcome the showing made by the plaintiffs that the contracts were made in good faith as normal business transfers. The contention to the contrary must fail.

The following cases are offered by defendant to support his argument: Updike v. Commissioner of Internal Revenue, 8 Cir., 88 F.2d 807, certiorari denied 301 U.S. 708, 57 S.Ct. 942, 81 L.Ed. 1362; Commissioner of Internal Revenue v. Wilder's Estate, 5 Cir., 118 F.2d 281, certiorari denied 314 U.S. 634, 62 S.Ct. 67, 86 Ed. 509; Holland v. Commissioner of Internal Revenue, 47 B.T.A. 807, affirmed 1 T.C. 564. Each can be distinguished from the instant case.

In the Updike case, supra, an assessment of taxes by the Commissioner was upheld against the sons of the deceased as transfers of his property under Secs. 315 (b) and 316 of the Revenue Act of 1926, 26 U.S.C.A.Int.Rev.Acts, pages 253, 254, on the ground that the transfer was made in contemplation of death. At the age of 85 deceased transferred all his property to his sons and on the same day executed his will, naming his sons as beneficiaries. The sons executed an agreement and delivered it to their father, likewise on the same day and as part of the same transaction, in which they promised to pay him during his lifetime $27,000 annually in quarterly installments. The father requested that $190,000 of the property transferred be set aside to secure these payments. Payments were made by the sons out of the transferred assets. The court recognized that under the circumstances of the case a different result would promote the evasion of estate taxes. It held that this was a type of testamentary disposition with which the statute intended to deal.

The case cited (Updike v. Commissioner of Internal Revenue) is replete with elements of motive and intent to confer a

gift and to transfer property in contemplation of death, whereas the case at bar is devoid of any clear-cut elements in that respect. The form and character of the agreement made in that case indicated a testamentary disposition. The consideration agreed to be paid to the father by the sons in the form of an annuity was insufficient as consideration and comprised only a portion of the value of the property transferred to the sons. There was abundant proof of affectionate family relations, that the bounty was not essential to the sons' welfare at the time, and that the father at the same time disencumbered himself of all of a large estate which in all probability would not be consumed in his lifetime.

Similarly, in the case of Wilder's Estate, supra, a husband transferred community money belonging to him and his wife to an insurance company on the promise by it to pay them during their joint lives, and on the death of either of them to continue to pay the survivor until his or her death, certain fixed sums under annuity contracts. This prompted the court to look behind the transaction. It found that it was a transfer at death without administration and the money was held to be taxable under the estate tax statute, 26 U.S.C.A.Int.Rev. Code, § 811, as part of the estate of the husband who predeceased the wife.

The case at bar is different from the cited case (Commissioner of Internal Revenue v. Wilder's Estate) in that the annuities purchased from the insurance company in the Wilder's Estate case were for the life of the decedent *and upon his death payments were to be continued for the life of his surviving wife*. In effect, decedent gave a fixed sum of money to be repaid to him at a small rate of interest for his life and postponed the enjoyment of the property by his wife until his death, thereby making a transfer by way of gift as a substitute for what was intended as a testamentary disposition.

The Holland case, supra, involved the sale of stock of a family corporation by a husband and wife to their children, reserving to themselves voting rights and a salary from the corporation for their lives. They continued in possession of the shares of stock as pledgees. The court considered such a transfer as one in which the income was reserved to the transferors for life and therefore held that the value of the stock should be included in the gross estate.

Again in the case cited (Holland v. Commissioner of Internal Revenue) there was also a situation where the possession or enjoyment of the property transferred was postponed until the death of the surviving transferor.

In both the Wilder's Estate and Holland cases it was established that there were attempts to avoid estate tax on the property transferred by way of gifts inter vivos reserving income to the respective donors until the death of their designated survivors.

Each of the three cases aforementioned involved an estate tax proceeding in which the measure of the tax was held to be the value of the transferred property at the time when death brought it into enjoyment, based on the decision of the Supreme Court in Helvering v. Hallock, 1940, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604, 125 A.L.R. 1368. The following language was used by the court in that case:

" * * * the statute taxes not merely those interests which are deemed to pass at death according to refined technicalities of the law of property. It also taxes inter vivos transfers that are too much akin to testamentary dispositions not to be subjected to the same excise." 309 U.S. at page 112, 60 S.Ct. at page 448, 84 L.Ed. 604, 125 A.L.R. 1368.

Even prior to the case of Helvering v. Hallock, supra, the Supreme Court had expressed its awareness of transactions of this nature in the case of United States v. Wells, 1931, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867, in the following language:

"The statutory description embraces gifts inter vivos, despite the fact that they are fully executed, are irrevocable and indefeasible. The quality which brings the transfer within the statute is indicated by the context and manifest purpose. Transfers in contemplation of death are included within the same category, for the purpose of taxation, with transfers intended to take effect at or after the death of the transferor. The dominant purpose is to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax." 283 U.S. at pages 116, 117, 51 S.Ct. at page 451, 75 L.Ed. 867.

Cognizance has not been lost of the relationship between income and estate taxes in connection with the property transferred in the case at bar. Such consideration is necessary for the realistic and practical approach to the subject of taxation which was advanced by the Supreme Court in the foregoing decisions. Complete and immediate possession and enjoyment of the

shares of stock transferred to the syndicate were irrevocably vested in it in the instant case. The facts herein, in contrast to the cases cited aforesaid, show that the transferees, the sons and the other syndicate members, entered into such possession immediately, and increased their salaries and voted themselves bonuses to be paid by the company, thereby enjoying the benefits of control and complete domination of the property transferred to the fullest extent. This is unlike the ordinary case where the taxpayer would be faced with the difficult burden of proving sufficient valuable consideration for the annuities he is to receive, the failure of which would give weight to a determination that the transaction was not bona fide but rather one in which the taxpayer was giving his property to a person whom, ultimately, he wished it to go upon his death. The difference lies in the fact that the examination of the value of the shares on the dates of the agreements was precluded in this case by the defendant's admission for the purpose of this case that the value of each share was represented by $400 and no more on those dates. The evidence upon which the court is asked by the defendant to find "inter vivos transfers akin to testamentary dispositions" is lacking in sufficiency.

It is true, as argued by the defendant, that C. V. Hill, being 72 years of age at the time of the execution of the contracts, must have had some thought of his approaching demise, and that normally, if he was interested in establishing himself in an annuity, he could be expected to purchase it from a recognized and sound insurance company instead of transferring his property to members of his family and others in exchange for their commitment to carry out an annuity scheme in his behalf. But these assumptions in themselves, together with suspicions which the transfers engender, buttressed by no other convincing proof in the case, neither demonstrate, nor give rise to, a legitimate inference that C. V. Hill intended to create a testamentary disposition of his property in the guise of the transfer he made during his lifetime.

We have here an absolute divestment by C. V. Hill of his interest in his shares of stock. We have complete control and domination over the transferred shares by the syndicate members. We have no substantial evidence of contemplation of death or intent to evade taxes by C. V. Hill at the time he executed the agreements. The idea of gift is negated by the well mechanized arrangement for valuation of the shares and allocation of annuity payments, bulwarked by defendant's concession of such value. It is true that the defendant may be as effectively prevented from collecting taxes under these circumstances as if there had existed an intent upon the part of C. V. Hill to evade them by a gift in contemplation of death. Notwithstanding, the existing law is not designed to cover the pattern formed by the circumstances of this case and if those circumstances are to lend themselves to the application of taxes, the Congress must express itself in additional legislation covering the premises, particularly in the field where annuities are created as in the case before us.

The next question for determination involves the manner in which this transaction should be treated in the income tax returns of C. V. Hill for the years 1935 and 1936. Plaintiffs argue that C. V. Hill realized and became taxable for capital gain at such time as payments were actually received by him in excess of his adjusted cost for the transferred stock.

In the case of Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143, shares of stock in a mining company were sold for cash and an agreement to pay annually a sum of money based on the tonnage of ore mined. The court decided that the transaction was a sale of stock on a future contingency having no ascertainable fair market value, and not a taxable exchange of property or a closed transaction. It held that no income was taxable until the return exceeded the cost. Other cases exemplary of the proposition that annuities, such as those in question, are not closed transactions and that capital gain is not taxable until the adjusted cost is returned to the annuitants, are Cassatt v. Commissioner of Internal Revenue, 3 Cir., 137 F.2d 745, Evans v. Rothensies, 3 Cir., 114 F.2d 958, Deering v. Commissioner of Internal Revenue, 40 B.T.A. 984, and Lloyd v. Commissioner of Internal Revenue, 33 B.T.A. 903, all cited by plaintiffs. The reasoning behind this proposition appears to be that the unascertainable value of the promise to pay made by the promisor creates uncertainty as to its fulfillment, i.e., the contingency as to whether the promisor will have the ability to meet the payments, the lack of which may result in the annuitant's failure to receive even the cost to him of the consideration he gave in return for the promise. This same contingency, how-

ever, continues to exist after the return to the annuitant by way of annuity payments of a sum equal to or exceeding the cost of the consideration given in return for the annuity. Consequently, the amount of taxable gain under an annuity contract will increase continuously upon the receipt of payments over and above cost and the entire capital gain can only be computed after it is received in the form of payments under the annuity contract by the annuitant, since the contingency of the promisor's ability to make the payments cannot be resolved until that time. This contingency extends to each individual payment and it is not overcome until the moment when the particular payment is made. It follows that taxable capital gain, the excess return to the annuitant over the cost to him of the shares of stock, must be determined in the taxable year in which it is received by the annuitant.

The promise of the syndicate in the instant case to make the payments under the annuity contracts had no ascertainable market value in 1935 and 1936. The question of the syndicate's ability to meet the payments at a later date made the value of the annuities uncertain for purposes of taxation. Until such time as C. V. Hill received the full value of the shares of stock he transferred, or his death prior thereto, the transaction cannot be considered as closed and the entire taxable gain or loss computed. The amount received by him over and above his adjusted cost is taxable gain in the years in which he received it.

The entire consideration upon the part of the purchasing syndicate consisted of (a) cash and (b) annuities. Under the first contract in 1935, $27,000 in cash was paid and the balance was provided for by way of annuity payments for the life of C. V. Hill, and under the second contract in 1936, $18,000 in cash was paid and the balance in annuity payments. The pertinent language of the agreements follows:

"Now, therefore, the said Clement V. Hill hereby agrees to sell, transfer and assign to the said J. Stuart Hill, as agent and representative of the Syndicate above mentioned, four hundred fifty (450) shares of common stock of the C. V. Hill and Co., Inc.

"In consideration whereof, the said Syndicate hereby promises and agrees to buy said shares of stock above mentioned and to pay to Clement V. Hill, upon the signing of this agreement, the sum of Twenty-seven Thousand Dollars ($27,-000.00) in cash and to further pay to Clement V. Hill monthly, during the life of the said Clement V. Hill, the sum of Fifteen hundred fourteen dollars and seventy cents ($1,514.70), the first payment being due January 31, 1936 and on the last day of each month thereinafter." Pp. 2, 3, Plaintiff's Exhibit 6—Contract of December 11, 1935.

"Now, therefore, the said Clement V. Hill hereby agrees to sell, transfer and assign to the said J. Stuart Hill and Chauncey V. Hill, Managers of the Syndicate above mentioned, four hundred fifty (450) shares of the common stock of the said C. V. Hill and Co. Inc., at Four Hundred ($400.00) Dollars per share for a down payment of Eighteen Thousand ($18,000.-00) Dollars and an annual payment of Twenty Thousand Four Hundred Forty Four Dollars and Forty Cents ($20,444.40) to Clement V. Hill for and during the life of said Clement V. Hill, said payment of Eighteen Thousand ($18,000.00) Dollars to be made upon the delivery of the stock; the first annual payment of Twenty Thousand Four Hundred Forty Four Dollars and Forty Cents ($20,444.40) to be made on the 31st day of January, 1937 and an annual payment of Twenty Thousand Four Hundred Forty Four Dollars and Forty Cents ($20,444.40) on the 31st day of each January subsequent thereto." Pp. 1, 2, of Plaintiff's Exhibit 8—Contract of January 6, 1936.

The language in each contract indicates clearly that there was to be a cash "down payment" as a part of the purchase price. These down payments were not installments under the annuity contracts. The cash down payment in each case was part of the purchase price of the stock and must be considered as a return of capital and cannot be considered as income under the annuity contract. The gain realized at the time of the transfer under the 1935 contract by reason of the down payment of $27,000 applies to the transaction of the sale of the stock and is not a return of part of the consideration of the annuity contract.

The adjusted cost of the shares transferred under the contract of December 11, 1935, was $19,500, (450 shares at $43 per share). C. V. Hill received a down payment of $27,000 before the close of 1935. Obviously this amount exceeded his ad-

justed cost and the excess is subject to computation as capital gain.

In 1936 he received his first annuity payments on the contract of December 11, 1935, totaling $18,176.40. He also received the sum of $18,000 as down payment for the second allotment of 450 shares transferred by him under his contract of January 6, 1936. These shares, similar to the first allotment, had a conceded value for the purpose of this case of $400 per share at the time of the contract of sale and an adjusted cost of $43 per share. During the course of 1936 he received nothing in addition to the down payment of $18,000 on his second contract because the first annuity installment under it did not become due and payable until January 31, 1937. His adjusted cost under the latter contract was $19,500, or $1,500 in excess of the down payment of $18,000 received by him. Therefore, in 1936, he was not required to pay taxes on that amount because his receipts had not yet exceeded his cost. He was required to include in his gross income for that year the sum of $18,176.40, the annuity payments received by him under his contract of December 11, 1935, subject to computation as capital gain, because they were totally in excess of his adjusted cost, for which he was more than reimbursed when he received the down payment of $27,000 in December, 1935.

There remains the question as to whether the annuities which C. V. Hill received as consideration for the transfer of the shares of stock were taxable under Sec. 22(b) (2) of the Revenue Act of 1936, 26 U.S.C.A.Int.Rev.Code, § 22(b) (2). This section excludes from gross income, income derived from an annuity contract in excess of 3% of the aggregate consideration paid for the annuity until the aggregate amount excluded each year equals the aggregate consideration paid for the annuity, whereupon the entire amount received each year thereafter must be included in gross income for that year. Defendant claims that 3% of the aggregate consideration paid for the annuity of 1935, ($180,000), less the cash down payment, ($27,000), which is part of the purchase price for the transfers of the stock and not to be considered as part of the consideration for the annuity, should have been included in gross income for the year 1936.

Plaintiffs do not question the legality of the statutory provision taxing annuities but argue that, since payments under the an-

nuity contracts are to be considered installments made toward the purchase price of the stock and to be reported as capital gain when received, the application of this section of the statute would constitute taxation of each payment for two purposes at the same time, i.e., as capital gain to the full amount of the payment and income as to 3% of the consideration paid for the annuities for each year in which payments were received.

At all times it is necessary to recall that we are dealing with issues in this case which revolve around the adjustment of *income* tax for the years 1935 and 1936. The critical date line is December 31, 1936, and while evidence of subsequent events until the death of C. V. Hill in 1939 were examined during the trial, such evidence was admitted only as it bore upon and reflected the issues involved in this case concerning income tax for the years in question.

We have held that since a value was concededly established for the shares of stock transferred by C. V. Hill, he was liable for tax upon so much as he should receive of the said value as was in excess of his adjusted cost of the shares at rates of taxation applicable to capital gain. Some of the excess so received was in the nature of annuity payments, and in 1934 Congress enacted a new form of tax treatment for payments received under annuity contracts and re-enacted it in 1936 under Sec. 22(b) (2) of the Internal Revenue Code, 26 U.S. C.A.Int.Rev.Code § 22(b) (2), which excludes from gross income—

"Amounts received (other than amounts paid by reason of the death of the insured and interest payments on such amounts and other than amounts received as annuities) under a life insurance or endowment contract, but if such amounts (when added to amounts received before the taxable year under such contract) exceed the aggregate premiums or consideration paid (whether or not paid during the taxable year) then the excess shall be included in gross income. Amounts received as an annuity under an annuity or endowment contract shall be included in gross income; except that there shall be excluded from gross income the excess of the amount received in the taxable year over an amount equal to 3 per centum of the aggregate premiums or consideration paid for such annuity (whether or not paid during such year), until the aggregate amount excluded from gross income under this title

or prior income tax laws in respect of such annuity equals the aggregate premiums or consideration paid for such annuity. In the case of a transfer for a valuable consideration, by assignment or otherwise, of a life insurance, endowment, or annuity contract, or any interest therein, only the actual value of such consideration and the amount of the premiums and other sums subsequently paid by the transferee shall be exempt from taxation under paragraph (1) or this paragraph."

Under this and former provisions of the law the entire annuity transaction was treated as a conversion of assets in which the purchaser of the annuity was to be allowed to recover his investment. Under the present section (identical in language with the Act of 1936 and the Act of 1934 when first introduced) the theory is that the annuitant who lives out his life expectancy receives the return of his consideration plus a low rate of interest which is used in calculating what the premiums should be. The section provides a method of allocating this additional return or gain to each payment. The payments may be considered to consist of a return of principal plus interest, and it is the interest element of the payment which is taxed.[3]

The question then arises that since capital gain receipts of C. V. Hill over and above his adjusted cost for his shares have been subjected to tax, and since insofar as those receipts are concerned they are the identical moneys received as annuity payments, may they as such be subjected again to the tax imposed upon annuitants? Had C. V. Hill sold his shares for cash and then speculated with the proceeds of the sale in the purchase of annuity contracts similar to those in suit, there can be no doubt that the provisions of Sec. 22(b) (2) would have attached to such annuity payments as he might receive. In this case it is true he did not consummate two separate transactions but what he did amounted to the same thing. There was a carefully established value placed upon the shares, conceded in this case to be correct, and then the greater part of the consideration to be paid to him was made the subject of a speculation (as all annuity contracts must be) wherein he stood to win if he could outlive a life expectancy as contemplated by the insurance companies dealing in such contracts and to lose if he did not live long enough. His annuity payments could only be taxable as capital gain from the point where they exceeded the adjusted cost of the shares to the point where they, in their aggregate, together with the down payments, equalled the full value placed upon the shares under each contract, namely, $180,000. We are constrained to the conclusion that at the same time the annuity payments were the subject of the arbitrary 3% taxation as provided under Sec. 22(b) (2) until his return in annuity payments, as calculated under that section, equalled his investment in his annuity contract, and then, if he continued to live, any cash annuity payment received thereafter must be treated as income under said section.[4]

---

[3] "The theory of the 1934 provision is explained in H. Rep. 704, 73rd Cong., 2nd sess. (1934), p. 21, reprinted in 1939-I (part 2) Cum. Bull. 554 at 569–70. 'Section 22(b)2. Annuities, etc.: The present law does not tax annuities arising under contracts until the annuitant has received an aggregate amount of payments equal to the total amount paid for the annuity. Payments to annuitants are, in fact, based upon mortality tables which purport to reflect a rate of return sufficient to enable the annuitant to recover his cost and in addition thereto a low rate of return on his investment. The change continues the policy of permitting the annuitant to recoup his original cost tax-free but requires him to include in his gross income a portion of the annual payments in an amount equal to 3 per cent of the cost of the annuity. While the per cent used is arbitrary, it approximates the rate of return in the average annuity.

'Statistics show that an increasing amount of capital is going into the purchase of annuities, with the result that income taxes are postponed indefinitely. The change merely places the return of this form of investment on the same basis as other forms of investment by taxing that portion of each payment which in fact constitutes income.' " 40 Mich.L.Rev. 1005, at p. 1010, n. 19.

See Taxation of Annuity Contracts under Federal Income Tax, Robert Meisenholder, 40 Mich.L.Rev. 1005, (1942).

[4] "Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 22(b) (2), Acts 1938, 1936, 1934, Sec. 22(b) (2). Under the 1932 and prior acts the statutory provision was different, annuities being treated in the statute as were other amounts received under life insurance, endowment or annuity contracts. See 1932, 1928 Acts, Sec. 22(b) (2); 1926 Act, Sec. 213(b) (2), 26 U.S.C.A. Int.Rev.Acts, pages 487, 354, 163. The 1924 and previous acts provided that the amounts received as a return of premiums

In summary, we conclude that the contracts entered into between C. V. Hill and the syndicate were made in good faith and did not constitute a gift to his sons, but in return for cash down payments and annuity contracts he transferred his 900 shares of stock in C. V. Hill & Co., Inc., which, for the purpose of this case, were conceded to have a value of $400 per share, or $360,000.

We further conclude that in so far as C. V. Hill was the recipient of moneys in excess of the adjusted cost of the stock transferred by him under the said contracts, such excess was subject to tax as capital gain in the years in which he received it, and we finally conclude that these same moneys when in the form of annuities were also subject to tax pursuant to the provision of Sec. 22(b) (2) of the Revenue Act of 1936, supra.

Computations of the income tax liability of C. V. Hill for the calendar years 1935 and 1936 should be made in accordance with this opinion and an order settled accordingly.

Findings of fact and conclusions of law follow.

### Findings of Fact.

1. C. V. Hill, a resident of Trenton, New Jersey, during his lifetime regularly reported his federal income tax on a cash basis and paid to the defendant, the Collector of Internal Revenue for the First District of New Jersey, wherein the City of Trenton is located, income tax for the calendar year 1935 in the amount of $9,513.04 and for the calendar year 1936 in the amount of $10,487.43.

2. Deficiencies of income tax for those years in the amounts of $384.14 and $2,014.-47, respectively, were paid by plaintiffs pursuant to a notice received on May 29, 1939.

3. In arriving at the 1936 deficiency of $2,014.47, defendant included in the gross income of C. V. Hill the sum of $4,590, representing taxable annuity income computed pursuant to the provisions of Sec. 22(b) (2) of the Revenue Act of 1936, 26 U.S.C.A.Int.Rev.Code, § 22(b) (2).

4. Claims for refund of income tax for each of those years were filed and disallowed by the Commissioner of Internal Revenue on September 12, 1939, and November 19, 1940, respectively.

5. On August 31, 1935, C. V. Hill entered into an agreement (Exhibit P-4 in this cause) with a syndicate composed of five individuals, namely, J. Stuart Hill and C. V. Hill, Jr., sons of C. V. Hill, and three others, all of whom were employees of C. V. Hill & Co., Inc., wherein it was provided:

"Now, be it agreed, that Clement V. Hill, for and in consideration of One dollar ($1.00), receipt whereof is hereby acknowledged, does give and grant to J. Stuart Hill, acting on behalf of the Syndicate herein mentioned, an option to purchase nine hundred (900) shares of Common stock on the following terms and conditions:

"1. That the determination of the fair sale value of said Common stock shall be submitted to a neutral and independent appraiser, mutually agreeable to both parties hereof.

"2. That, upon submission in writing of the fair sale value of said stock to both parties hereto, the Syndicate may have the option to purchase for cash, within thirty (30) days thereafter, the entire amount of stock as set forth in this agreement, upon the basis of the fair sale value as determined by the appraiser."

6. The syndicate was formally organized by virtue of an agreement (Exhibit P-5 in

---

under a life insurance, annuity or endowment contract, either during the term or at the maturity of the term mentioned in the contract or on surrender of the contract, should be exempt. 1924, 1921, 1918 Acts, Sec. 213(b) (2), 26 U.S.C.A. Int.Rev.Acts, page 19, and 42 Stat. 238 and 40 Stat. 1065; see also Reg. 65, 62, 45, Art. 47. The change which was made in the 1934 Act was prompted by the desire to tax that part of the annuity payment which represented a yield on the investment. Under the acts prior thereto, the total amount received escaped tax until the annuitant had received payments aggregating the amount paid for the annuity. Ways and

Means Committee Report No. 704, 73rd Cong., 2nd Sess., p. 21; Senate Finance Committee Report No. 558, 73rd Cong., 2nd Sess., p. 23; Conference Report No. 1385, 73rd Cong., 2nd Sess., p. 3.

The use of 3% in the 1934 Act as representing a yield on the investment was purely arbitrary and was intended to reflect the then approximate rate of return in the average annuity." Mertens—Law of Federal Income Taxation, 1942 Ed., Vol. 1, § 6.30, p. 281, n. 14.

Of course, in the case before us we are required to deal with only one year involving annuity payments, namely, the year 1936.

this cause) between J. Stuart Hill and C. V. Hill, Jr., named therein as "Syndicate Managers," and J. Tinley Knotts, Earl J. Kressler and Frank D. MacMaster, the other members of the syndicate, entered into on December 9, 1935, which, in addition to setting forth the terms upon which the members entered this agreement and their obligations thereunder, provided as follows:

"Whereas Clement V. Hill, the owner of ten hundred ninety-six (1096) shares of Common stock of the C. V. Hill & Co., Inc., has expressed his intention to sell nine hundred (900) shares of said stock and to invest the funds derived from this sale in a non-refundable life annuity and has offered to the said Syndicate the nine hundred (900) shares of Common stock or any part thereof on the same basis and with the same benefits as would be derived from the investment of an amount of the value of said stock in a non-refundable life annuity:

"Now, therefore, in consideration of the premises, and of their mutual promises, the parties hereto, and the Syndicate of subscribers, severally, agree with each other and with the Syndicate Managers as follows:

"I. The parties hereto form a Syndicate, (to be styled the Hill Syndicate), for the purpose of acquiring four hundred, fifty (450) shares Common stock of the C. V. Hill Co., Inc., from Clement V. Hill, upon terms satisfactory to the Syndicate Managers, and, having acquired the same, of controlling and disposing of the same as may be determined by the Syndicate Managers to be for the benefit of such Syndicate.

"II. Each member of the Syndicate shall purchase of the four hundred, fifty (450) shares of stock mentioned above the following amounts: J. Stuart Hill, one hundred, seventy-five (175) shares; Chauncey V. Hill, one hundred, seventy-five (175) shares; J. Tinley Knotts, forty-five (45) shares; Earl J. Kressler, forty (40) shares; Frank D. MacMaster, fifteen (15); and each member shall be called upon to pay, and be liable only for, such amount as shall bear, to the obligation of the Syndicate, the same ratio, or proportion, as his holdings in the agreement bears to said maximum obligation.

"The funds of the Syndicate shall be applied, used, and disbursed by the Syndicate Managers for the purposes above set forth and for such other purposes as may become necessary in carrying out the Syndicate plans."

7. It was not disputed that the cost of the non-refundable annuities at the monthly and annual rates, as provided under the terms of the contracts between C. V. Hill and the syndicate, would amount to $153,000 and $162,000, respectively.

8. A contract, dated December 11, 1935 (Exhibit P-6 in this cause), was entered into between C. V. Hill and J. Stuart Hill, for and on behalf of the syndicate, wherein it was provided:

"Whereas, it was mutually agreed between the parties hereto that the determination of the value of said common stock should be submitted to a neutral and independent appraiser, mutually agreeable to all parties hereto, and that, upon submission in writing of said value to all parties hereto by said appraiser, the Syndicate was to have the option of purchase for cash, within thirty (30) days thereafter, nine hundred (900) shares of the common stock of the C. V. Hill and Co., Inc., and

"Whereas, in accordance with the above agreement, the Arthur F. Morton and Company, of Philadelphia, Pennsylvania, certified public accountants, was selected and engaged by all parties hereto to determine the fair sale value of nine hundred (900) shares of common stock of the C. V. Hill and Co., Inc.; and

"Whereas, the said Arthur F. Morton and Company have, under date of December 4, 1935, submitted a written report of that firm's determination of the fair sale value of nine hundred (900) shares of stock as above mentioned, which value has been determined to be Three Hundred Sixty Thousand Dollars ($360,000.00); and

"Whereas, the value so determined has been considered by the parties hereto and is acceptable to said parties for the purpose of purchasing and sale of said nine hundred (900) shares of stock; and

"Whereas, Clement V. Hill has expressed to the members of said Syndicate his intention to invest the funds derived from this sales in a non-refundable life annuity and has obtained from reliable sources the amount which One Thousand Dollars ($1,000.00) will buy on monthly and annual payment bases and that such amounts are One Hundred Eighteen Dollars and Eighty Cents ($118.80) and One Hundred Twenty-six Dollars and Twenty Cents ($126.20) respectively, if purchased

between December 10, 1935, and January 10, 1936; and

"Whereas, Clement V. Hill has granted to the said Syndicate the opportunity to purchase any or all of this stock on the same basis and with the same benefits as would be derived from the investment of the proceeds of said sale in a non-refundable life annuity; and

"Whereas, the Syndicate mentioned herein is desirous of taking advantage of the opportunity to purchase said stock on the annuity basis as suggested by Clement V. Hill;

"Now, therefore, the said Clement V. Hill hereby agrees to sell, transfer and assign to the said J. Stuart Hill, as agent and representative of the Syndicate above mentioned, four hundred fifty (450) shares of common stock of the C. V. Hill and Co., Inc.

"In consideration whereof, the said Syndicate hereby promises and agrees to buy said shares of stock above mentioned and to pay to Clement V. Hill, upon the signing of this agreement, the sum of Twenty-seven Thousand Dollars ($27,000.00) in cash and to further pay to Clement V. Hill monthly, during the life of the said Clement V. Hill, the sum of Fifteen hundred fourteen dollars and seventy cents ($1,514.-70), the first payment being due January 31, 1936 and on the last day of each month thereinafter

"In further consideration for the purchase of said stock, Clement V. Hill does grant for a period of ninety (90) days from the date hereof to J. Stuart Hill, for and on behalf of said Syndicate, the option to purchase Four Hundred Fifty (450) additional shares at Four Hundred Dollars ($400.00) per share for a down payment of Eighteen Thousand dollars ($18,000.00) and an annual payment for life of Twenty Thousand Four Hundred Forty-four Dollars and Forty Cents ($20,444.40), during the life of the said Clement V. Hill, on the same general terms and conditions as set forth herein, the dates of the annual payments to be determined on the day the option is exercised."

9. The option contained in the December 11, 1935, contract was exercised by the syndicate and a contract was entered into between the parties on January 6, 1936 (Exhibit P-8 in this cause), wherein it was provided:

"Now, therefore, the said Clement V. Hill hereby agrees to sell, transfer and as-sign to the said J. Stuart Hill and Chauncey V. Hill, Managers of the Syndicate above mentioned, four hundred fifty (450) shares of the common stock of the said C. V. Hill and Co., Inc., at Four Hundred ($400.00) Dollars per share for a down payment of Eighteen Thousand ($18,000.-00) Dollars and an annual payment of Twenty Thousand Four Hundred Forty Four Dollars and Forty Cents ($20,444.40) to Clement V. Hill for and during the life of said Clement V. Hill, said payment of Eighteen Thousand ($18,000.00) Dollars to be made upon the delivery of the stock; the first annual payment of Twenty Thousand Four Hundred Forty Four Dollars and Forty Cents ($20,444.40) to be made on the 31st day of January, 1937 and an annual payment of Twenty Thousand Four Hundred Forty Four Dollars and Forty Cents ($20,444.40) on the 31st day of each January subsequent thereto."

10. The contracts and agreements described as Exhibits P-4, P-5, P-6 and P-8 were consummated in accordance with their terms.

11. C. V. Hill was 72 years of age at the time of the agreements dated December 11, 1935, and January 6, 1936.

12. Prior to the time of the execution of the contracts and subsequent thereto, C. V. Hill was hospitalized from time to time for various ailments and for a rest period, and finally expired on February 4, 1939, of an illness diagnosed as cancer of the stomach.

13. Prior to the execution of the aforementioned agreements, C. V. Hill was president and a director of C. V. Hill & Co., Inc., and his sons, J. Stuart Hill and C. V. Hill, Jr., were general manager and sales manager, respectively. Immediately upon the execution of the December 11, 1935 agreement, C. V. Hill resigned as president and as a director and thereafter the syndicate members elected themselves directors. J. Stuart Hill and C. V. Hill, Jr., were named as president and vice president, respectively.

14. C. V. Hill no longer participated in the management of the business after the agreement of December 11, 1935.

15. The shares of stock acquired by the syndicate under the agreements, together with shares owned by the individual members, enabled it to enjoy a majority interest in the company, and upon the execution of the agreement of January 6, 1936, the sons, J. Stuart Hill and C. V. Hill, Jr., were the owners of more than

50% of the outstanding common stock of C. V. Hill & Co., Inc.

16. The earnings of the company in prior years were substantial and in excess of the undertaking of the syndicate to pay the sums due under the contracts with C. V. Hill, and there was no evidence showing that this income was likely to diminish in the future.

17. Upon taking over the business, the members of the syndicate increased their salaries and voted themselves large bonuses.

18. The payments to be made to C. V. Hill by the syndicate members were derived from the earnings of the C. V. Hill & Co., Inc., and it was the expectation of the said members to make such payments out of their salaries and bonuses from the company.

19. C. V Hill reported his 1935 income as if he had sold 450 shares of stock for cash or its equivalent, i.e., as a closed or completed transaction for the sale of the shares. He reported a total capital gain of $157,500 from the transaction, based upon the consideration he received for the shares ($180,000) and upon a cost basis to him of $22,500, or the par value of $50 per share.

20. C. V. Hill reported his 1936 income in the same manner as his 1935 income, likewise computing a capital gain of $157,500 from the transaction covering the sale of the remaining 450 shares of stock in January of 1936, based on a consideration received of $180,000 and a cost to him of $22,500.

21. An audit of the 1935 and 1936 income tax returns by the defendant terminated in the adjustment of the cost basis of the stock to C. V. Hill from $50 per share to $43 per share, which gave rise to deficiencies of income tax for those years, subsequently paid by plaintiffs.

22. Defendant at the trial conceded that for the purpose of this case, the shares of stock had a fair market value of $400 per share, and no more, on December 11, 1935, and January 6, 1936, the dates of the agreements to sell the shares.

23. There was no evidence of any security for the payments to be made by the syndicate, other than the promises contained in the contracts of December 11, 1935, and January 6, 1936, respectively.

24. The contracts of December 11, 1935, and January 6, 1936, provided for cash down payments of $27,000 and $18,000, respectively, as portions of the purchase price for the sale of the shares of stock.

## Conclusions of Law.

1. The agreements between C. V. Hill and the syndicate, dated December 11, 1935, and January 6, 1936, to sell the shares of stock were for money or money's worth and were made in good faith.

2. Under the said contracts the shares of stock passed to and became irrevocably vested in the syndicate.

3. The syndicate entered into and exercised complete possession, control, enjoyment, and domination of the shares of stock transferred under the contracts immediately upon the execution thereof.

4. The evidence failed to disclose that at the time of the execution of the contracts C. V. Hill was suffering from more than ordinary ailments to be expected in a man of his years and that he was not affected by them to the extent that he would anticipate that his death was imminent or that he would not outlive his life expectancy.

5. The promises to make the annuity payments under the contracts had no ascertainable market value in 1935 and 1936.

6. The down payments and annuity payments for which provision was made in the contracts were return of, and on, capital.

7. The sales of the shares of stock under the said contracts were not closed or completed transactions at the time of the execution thereof, so as to make C. V. Hill subject to tax for capital gain upon the full value thereof, but did render the amounts he received in excess of the adjusted cost of the shares taxable in the years in which he received them.

8. C. V. Hill was required to include in his income tax return for 1935 moneys received by him in that year, under the contract of December 11, 1935 (the down payment of $27,000), over and above his adjusted cost of the shares transferred under the contract, to be computed as capital gain.

9. C. V. Hill was required to include in his income tax return for the year 1936 all annuity payments received by him during that year, under the contract of December 11, 1935 (12 payments of $1,514.70, or a total of $18,176.40), to be computed as capital gain.

10. The annuity payments as such received by C. V. Hill in 1936 under the December 11, 1935, contract were subject to taxation pursuant to Sec. 22(b) (2) of the Revenue Act of 1936, 26 U.S.C.A.Int.Rev. Code § 22(b) (2), at the same time that they were taxable as capital gain.