SIMON M. LAZARUS, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4886-69—4888-69. Filed August 17, 1972.

*Ben Margolis, Harry Margolis, Sol Scope,* and *William B. Murrish,* for the petitioners.

*Sheldon M. Sisson,* for the respondent.

---

[1] The proceedings of the following petitioners are consolidated herewith: Mina Lazarus, docket No. 4887-69; and Simon M. Lazarus and Mina Lazarus, docket No. 4888-69.

FEATHERSTON, *Judge:* Respondent determined tax deficiencies and additions thereto under section 6651(a) [2] as follows:

| Docket No. | Kind of tax | Year | Amount | Addition to tax (sec. 6651(a)) |
|---|---|---|---|---|
| 4886–69 | Gift | 1963 | $75,644.31 | $18,911.08 |
| 4887–69 | Gift | 1963 | 75,644.31 | 18,911.08 |
| 4888–69 | Income | 1963 | 7,695.00 | |
|  | Income | 1964 | 31,174.00 | |
|  | Income | 1965 | 30,175.00 | |

In an amendment to answer in docket No. 4888–69, respondent asserted further income tax deficiencies as follows:

| Year | Amount |
|---|---|
| 1963 | $5,956 |
| 1964 | 32,889 |
| 1965 | 76,041 |

Concessions having been made, the issues remaining for decision are as follows:

(1) Whether petitioners' transfer of their corporate stock to a foreign situs trust was a sale in consideration for annuity payments, or a transfer to the trust subject to a retained right to the income so that the transaction falls under section 677;

(2) Whether petitioners made a gift to the trust of a portion of the value of the stock;

(3) Whether certain lease deposits, retained by Simon M. Lazarus upon the formation of N & V Realty Corp., represent income to petitioners in 1963; and

(4) Whether interest paid by petitioners on mortgages on the shopping center during 1964 and 1965 is properly deductible.

## FINDINGS OF FACT

Simon M. Lazarus (hereinafter referred to as petitioner) and Mina Lazarus (hereinafter referred to as Mina), husband and wife, were legal residents of Los Angeles, Calif., at the time they filed their petitions herein. They filed their joint Federal income tax returns for 1963, 1964, and 1965 with the district director of internal revenue, Los Angeles, Calif. Neither petitioner nor Mina filed a Federal gift tax return for 1963. (Hereinafter, when the word "petitioners" is used it will refer to both petitioner and Mina.)

In 1955, petitioners purchased an interest in an unimproved parcel of real property in Los Angeles, Calif. This property was acquired

---

[2] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

jointly by petitioners; Ben Margolis (hereinafter Margolis), counsel for petitioners in the present matter; John T. McTernan, an associate of Margolis; and Eleanor Kaley, the mother-in-law of Margolis.

Shortly after the purchase of the land, the County of Los Angeles condemned a portion of the acreage. At this point, petitioners entered into negotiations with Fox Markets for the building of a market and shopping center. Margolis voiced his objection to the proposed lessee, and petitioners then purchased the interests of Margolis and Eleanor Kaley. Petitioners later acquired John T. McTernan's interest in the land.

Petitioner arranged an interim construction loan with Union Bank and a permanent loan with Connecticut General Life Insurance Co. The shopping center, known as the Fox Shopping Center (hereinafter referred to as Fox Shopping Center or shopping center), was built during 1958 and 1959.

In about 1960, Fox Markets went into bankruptcy. The market located in petitioners' shopping center, however, was a very profitable one, and had great potential value. During the next 18 months, considerable litigation ensued. The controversy was finally settled in 1962, when a new 20-year lease was entered into between petitioners and Food Fair, another supermarket chain.

For a number of years, petitioner had discussed with his advisers various types of estate- and tax-planning techniques. At the time of the controversy concerning the Fox Market, petitioner and Mina were both in their middle 60's, petitioner having been born April 19, 1894, and Mina having been born December 24, 1897. The combination of their ages, the Fox Market bankruptcy difficulties, illnesses of some of petitioners' children and their spouses, some marital problems on the part of the children, and certain developments with regard to other property belonging to petitioners all led petitioner to an earnest consideration of possible estate- and tax-planning techniques. After investigating the various uses to which their property could be put—including the sale of certain property and reinvestment of the proceeds from the sale—it was decided that the Fox Shopping Center would be transferred to a trust. The legal arrangements for the transfer were handled by Harry Margolis (hereinafter referred to as Harry), the brother of Margolis.

Harry consulted with Arawak Trust Co. Ltd. (hereinafter Arawak), a licensed trust company created as a Bahamian corporation and operating in the city of Nassau, Bahamas. On prior occasions, Arawak had served as the trustee for trusts created by several of Harry's clients. Arawak previously had not entered into a transaction of the type proposed by Harry, and a number of issues were raised. After consultation with its New York counsel and its Nassau counsel, Arawak

decided that certain conditions would have to be met before it would proceed with the transaction: (1) Arawak as trustee would not take the operating property directly, but would take the property in the form of stock in a corporation formed to own it; (2) someone familiar with the Fox Shopping Center operations would be involved in its management; and (3) Arawak would intend to dispose of the ownership of the shopping center almost at once. After a number of discussions were held between Arawak and Harry during 1962 and early 1963, final agreement was reached on the creation of the trust and the transfer of the shopping center to the trust.

Pursuant to the estate plan developed by their attorneys, petitioner and Mina as trustors entered into a trust agreement on April 30, 1963, establishing an irrevocable trust with Arawak as trustee, and funded the trust with $1,000. The agreement named as beneficiaries the daughters of the trustors, all the children of such daughters, as well as the mother of Mina, and any and all persons related by blood, legal adoption, or through marriage to any of the named beneficiaries, excluding the trustors.

The trust instrument contained various conditional provisions regarding the accumulation and distribution of income and corpus during the lives of the trustors and following their deaths. The trustee was granted broad powers with respect to the trust property; however, the petitioner as trustor reserved the right to replace the current trustee with another independent corporate fiduciary. The exercise of this power required the concurrence of the eldest living beneficiary.

On April 15, 1963, petitioners caused to be formed a California corporation called N & V Realty Corp. (hereinafter N & V or N & V Realty). On October 1, 1963, the shopping center was transferred by petitioners to N & V Realty in exchange for stock with the same market value as the property.

Petitioners personally remained obligated on the balance of the mortgage indebtedness which had been incurred at the time of the construction of the shopping center.

At about the same time, petitioner formed another California corporation known as Lazarus Realty Co. (hereinafter Lazarus) which served as the vehicle through which petitioner and Mina performed their management obligations with respect to the shopping center.

Sometime prior to petitioners' transfer of the shopping center to N & V Realty for the stock therein, petitioner had received the sum of $14,775 from the lessees under the various leases of the stores located in the Fox Shopping Center. This sum represented deposits by the lessees as security for due performance under the terms and conditions of the leases. The deposits were to be applied to minimize last-

term rent charges only at the end of the term of each lease, provided there was no breach of any of the conditions of the lease. When petitioners contributed the shopping center to N & V Realty in exchange for the stock, they did not transfer the security deposits to the corporation, but retained them.

On December 18, 1963, N & V Realty and Lazarus entered into an agreement whereby Lazarus, through the services of petitioner and Mina, was to manage the shopping center owned by N & V Realty. The management agreement called for Lazarus to provide all management services, including the negotiation of leases, for a fee of $24,000 per year at the rate of $2,000 per month. The agreement further provided that the management contract was predicated upon the joint availability and performance of petitioner and Mina, and that N & V Realty had the right to terminate the agreement on the death of either petitioner or Mina. The agreement otherwise could not be terminated except "for cause."

On December 1, 1963, with the knowledge and consent of petitioner, Arawak was replaced as trustee for the trust created by petitioners by Aruba Bonaire Curacao Trust Co. Ltd. (hereinafter referred to as ABC), a licensed trust company created as a Bahamian corporation and operating in the city of Nassau, Bahamas. Neither petitioner nor Mina had any interest in ABC.

Pursuant to the overall estate plan which had been discussed between Arawak and petitioner concerning the transfer of the shopping center to the trust, petitioners and ABC on December 18, 1963, entered into what was labeled an "Annuity Agreement." It recited that petitioner and Mina, contemporaneously with the execution of the agreement, transferred to ABC all the capital stock of N & V Realty in consideration of ABC's agreement to pay to petitioners the sum of $75,000 per year. The payments were to be made on or before June 30 of each year, beginning in 1964, for the period of petitioner's and Mina's lives, including the full life of the survivor. Petitioners had a joint and survivor life expectancy of about 21 years. The fair market value of the stock of N & V Realty, and of its shopping center property, was $1,575,000. Petitioners' basis in the stock of N & V Realty at the time of transfer to the trust was $718,406.

The agreement provided, in part, that:

4. The parties do not intend any gift by Lazarus to ABC or by ABC to Lazarus hereunder. The parties have agreed that they are respectively receiving full fair value.

5. No security of any kind has been reserved for this Annuity Agreement, and it is understood that ABC has full right to dispose of this stock or otherwise deal with it in any way it wishes without any consultation with or responsibility to Lazarus.

Aside from the initial funding of $1,000 at the time petitioner and Mina entered into the trust agreement with Arawak, and the subsequent transfer of the N & V Realty stock, no assets had been transferred to or added to the trust as of the date of the trial.

On January 1, 1968, petitioners and ABC, as trustee, signed a revised "Annuity Agreement" which provided that petitioner would receive an annual payment of $62,500 for life and Mina would receive $42,500 annually for life, beginning in 1968.

On January 2, 1964, the stock of N & V Realty was sold to a Bahamian corporation entitled World Entertainers Ltd. (hereinafter referred to as World Entertainers). As consideration for the transfer of the stock, World Entertainers executed a "Non-Negotiable Promissory Note" (hereinafter World Entertainers' note or note), agreeing to pay to ABC, as trustee, the sum of $1 million on January 1, 1984. The note also provided that ABC was to receive annual interest payments of $75,000. Such payments were to be made on June 1 of each year, beginning in 1964, and continue until the principal was paid or redetermined in the manner described below.

The note further provided that "No prior payment of principal shall be required" except pursuant to a provision which permits the trustee "At any time on or before the Thirty-first day of December A.D. 1981 * * * to accellerate [sic] the payment of the principal sum." Under this provision, by giving written notice which "must set a date not earlier than one year nor later than two years thereafter," the principal sum due under the note could be redetermined. The redetermined principal would represent, as of 1 year from the date of the written notice, the appraised "value of all the assets of the N and V Realty Corporation" held on January 1, 1964.

The redetermined principal would then be payable at the rate of $100,000 each year, beginning on "the same day of the same month but in the second calendar year after the notice of accelleration [sic]." The annual payments of principal will be accompanied by proportionate interest adjustments. "Should * * * [World Entertainers] decline to accept the final figure of the appraisal, it may transfer title to the * * * [trustee] of all of the assets involved, and such transfer shall immediately constitute full payment of this non-negotiable Promissory Note and interest shall be prorated to the date of such transfer of title."

Within a short time after the acquisition, World Entertainers sold the N & V Realty stock for an undisclosed price to Associated Arts, N.V. (sometimes hereinafter AA), a Netherlands Antilles corporation. Neither petitioner nor Mina had any direct or indirect interest in Associated Arts, N.V.

In April 1964, Associated Arts, N.V., sold the stock in N & V Realty to Branjon, Inc. (hereinafter Branjon), a California corporation which was wholly owned by Leo Branton, Jr. (hereinafter Branton), a former law associate of Margolis. The purchase price, payable over a 37½-year period, was stated as $3 million plus $750,000 interest. This price represented the stock's fair market value of $1,575,000 plus capitalization of interest of $1,425,000 and regular interest of $750,000.

After acquiring the stock of N & V Realty, Branjon dissolved the corporation and disposed of the land on which the shopping center was situated to a number of family trusts, and disposed of the buildings and other improvements to a number of undivided interests. Between 1964 and early 1968, the undivided interests owned the property; however, in 1968, these interests were repurchased by Branjon.

Shortly thereafter, Branton sold all the stock of Branjon to an unrelated California corporation, Bonaire Development Co. (hereinafter Bonaire), which merged Branjon into its operations in early 1969 and which now owns the shopping center. Petitioner and Mina have never had and do not have any direct or indirect connection with Bonaire, or any of its related holdings, and took no part in the negotiations of the sales and transfers of the shopping center and land between 1964 and 1969.

From the execution of the management contract between N & V Realty and Lazarus on December 18, 1963, through the various transfers of the stock of N & V Realty, petitioner and Mina continued to carry out their management functions as employees of Lazarus. They handled tenants' complaints, arranged for repairs when the owners were required to make them, negotiated the leases with the tenants, collected the rents and accounted therefor and paid them over to the owners, and performed other services required of them. Throughout the years, separate operating accounts were maintained in the names of the owners and all moneys received as rents were deposited in these accounts. After Branjon purchased N & V Realty and then dissolved the corporation, petitioner and Mina, acting for Lazarus, continued to manage the shopping center for the various owners until 1967.

When Branjon acquired the stock of N & V Realty in 1964, Branton voiced objection to the outstanding management contract with Lazarus. The controversy over this contract continued until 1967, when a settlement was reached. As part of the settlement, petitioner and Mina transferred all their interest in Lazarus to Branjon, repaid $40,000 in management fees they had received throughout the term of their service with Lazarus, and accepted the cancellation of the management contract as of the end of 1967. They also provided

for the payoff of the outstanding construction loans secured by the shopping center, and paid over to Branjon the lease security deposits of the various tenants which had been received and retained by petitioner. As of the end of 1967, petitioner and Mina ceased all personal management responsibility with respect to the Fox Shopping Center.

Between 1964 and 1970, petitioner and Mina received the following payments from the trust:

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| 4/16/64 | $20,000 | Total 1967 | _____ |
| 6/22/64 | 55,000 | 11/25/68 | $125,000 |
| Total 1964 | 75,000 | 11/25/68 | 42,500 |
| 4/9/65 | 75,000 | Total 1968 | 167,500 |
| 10/21/65 | 75,000 | 10/27/69 | 42,500 |
| Total 1965 | 150,000 | Total 1969 | 42,500 |
| 3/12/66 | 75,000 | 9/2/70 | 42,500 |
| Total 1966 | 75,000 | Total 1970 | 42,500 |

Between 1964 and 1967, the Fox Shopping Center produced the following amounts of gross income:

| Year | Approximate amount |
|------|--------------------|
| 1964 | Between $100,000 and $127,200 |
| 1965 | 127,200 |
| 1966 | 131,300 |
| 1967 | 141,953 |

In their 1963 joint income tax return, petitioner and Mina reported gross rents received from the shopping center of $108,253. They claimed related deductions of approximately $61,200 for a net profit of about $47,000. They also noted that the assets of the shopping center were exchanged for the stock of N & V Realty on October 1, 1963.

In their 1964 joint income tax return, petitioner and Mina reported no income from payments received pursuant to the "Annuity Agreement." They treated the receipts as payments pursuant to a private annuity arrangement. Using an "Investment in contract" of $1,575,000, and an "Expected return" of the same amount, they determined that the "Percentage of income to be excluded" as annuity income was 100 percent. In an explanation attached to their return, they stated:

On November 18, 1963 [sic], taxpayers transferred all of the stock of N & V Realty Corporation in exchange for a private annuity. The stock had been acquired April 15, 1963, and had a basis of $718,406. The fair market value of the stock was $1,575,000. Taxpayers are to receive $75,000 per year for life on a joint and survivor basis, the actuarial term of which is twenty one years. Taxpayers elect to report only such installments as may be actually received by them and taxpayers herewith report the payments received as being a recovery of basis only at this time.

In their 1965 joint income tax return, petitioner and Mina repeated the explanation quoted above from their 1964 return and reported the receipt of $75,000 as a recovery of basis. In addition, they again used the 100-percent exclusion ratio as to income and reported no income from the "annuity."

During the years in issue, petitioners claimed interest deductions for the payments made on the shopping center mortgage loans which had been incurred at the time it was constructed, as follows:

| Year | Amount |
| --- | --- |
| 1964 | $35,327 |
| 1965 | 38,830 |

In his notice of deficiency, respondent determined that with respect to 1963, petitioners realized a gain of $14,775 from the assumption by N & V Realty of their liability for the tenants' security deposits retained by them. He also disallowed the interest deductions for the amounts paid on the mortgage loans for all 3 years. In addition, he determined that petitioners were taxable on their receipts from the trust under the annuity provisions. Respondent also issued notices of deficiency for 1963 for petitioner and Mina individually, determining gift taxes owed for that year based on a gift to the trust of the difference between the fair market value of the property transferred to the trust and the "present value of the annuity" when it was created in 1963.

In an amendment to answer filed in docket No. 4888–69, respondent alleged that additional deficiencies in income tax for 1963, 1964, and 1965 were due on the theories (1) that petitioners never relinquished control of the shopping center and were, therefore, taxable on the net rental income from the leases during the years in issue, and (2) that the substance of the transaction was a transfer to the trust subject to the reservation of the income thereof.

OPINION

## 1. *Income Tax Liabilities*

The parties agree on the essential facts involved in the case and have stipulated that, during the first 4 years of the life of the trust, petitioners received payments totaling $300,000, i.e., at the average rate of $75,000 per year.[3] They differ only as to the character of petitioners'

---

[3] It is stipulated that petitioners received from the trust $75,000 in 1964, $150,000 in 1965, $75,000 in 1966, and nothing in 1967. The amount of the $150,000 payment in 1965, the second calendar year of the life of the note, and the absence of any payment in 1967, the fourth year, are not explained. We infer that World Entertainers made an advance payment of interest in 1965 because, even if the trust had elected to have the principal redetermined, the note does not call for any payments on the redetermined principal for 2 years after notice of such election.

receipts from the trust; that is, whether such receipts were considera-
tion for the sale of their N & V stock or distributions of trust income.

Petitioners contend that they sold their N & V stock to the trust in
consideration for a "private annuity agreement" which did not have
an ascertainable fair market value. Consequently, they urge, they
realized no taxable gain in the year of the sale and will realize no such
gain until they have recovered their adjusted basis ($718,406) in the
N & V stock.[4] Moreover, since the transaction took the form of a sale
for adequate consideration, petitioners maintain, they incurred no
gift tax on the transfer to the trust; and, under the rationale of their
position, at the time of their deaths neither of their estates will owe
any estate tax with respect to the N & V stock or its proceeds.

In other words, petitioners contend that they have so arranged the
disposition of their shopping center that they will receive $75,000 per
year as long as they live, will pay no income tax on the first $718,406 of
their receipts, and will pay income tax at capital gain rates on the
balance of their receipts, if any. Furthermore, under their analysis, the
value of the N & V assets remaining at their deaths will pass to their
children and grandchildren without any gift tax or estate tax having
been incurred.[5]

Respondent contends that the substance of the transaction was not
a sale but was a transfer of property to the trust for the benefit of
petitioners' children and grandchildren, subject to a reservation of the
right to have the yearly income of the trust ($75,000) distributed an-
nually to petitioners, or the survivor of them, for life. On this ground,
respondent maintains that petitioners are taxable on the payments
which they received from the trust during the years in controversy.[6]

Respondent's position is based on section 677(a)[7] which provides

---

[4] In this connection, petitioners cite *Commissioner* v. *Kann's Estate*, 174 F. 2d 357, 359
(C.A. 3, 1949) ; *J. Darsie Lloyd*, 33 B.T.A. 903, 905 (1936) ; *Hill's Estate* v. *Maloney*,
58 F. Supp. 164, 171–172 (D. N.J. 1944), together with *Burnet* v. *Logan*, 283 U.S. 404,
412–413 (1931). This line of cases is discussed in the text *infra*.

[5] Still further tax savings, of course, may be derived from the fact that the trust is a
foreign entity.

[6] Since we agree with this position, we need not consider respondent's other argument
that the annual payments, if "annuity payments," are taxable under sec. 72. We agree
with petitioners that respondent has not carried his burden of showing that the trans-
action was a sham. In this complicated set of facts, there are circumstances indicating
petitioners actually sold their N & V stock to Branjon and ran the transaction through
the foreign situs trust as a conduit to avoid a tax on their capital gain; however,
respondent does not so contend, and the record is not sufficiently complete to permit a
finding to this effect.

[7] SEC. 677. INCOME FOR BENEFIT OF GRANTOR.

(a) GENERAL RULE.—The grantor shall be treated as the owner of any portion of a
trust, whether or not he is treated as such owner under section 674, whose income without
the approval or consent of any adverse party is, or, in the discretion of the grantor or
a nonadverse party, or both, may be—

    (1) distributed to the grantor ;

    (2) held or accumulated for future distribution to the grantor ; or

that the grantor shall be treated as the owner of a portion of a trust if, among other things,[8] the income therefrom is, or may be, distributed to him. If under that section the grantor is treated as the owner, section 671 specifies that he shall be taxed on the trust's income and shall be entitled to its deductions and credits.

While the tax savings sought by petitioners are concededly considerable, we think respondent errs in placing such heavy emphasis as he does on the tax results which petitioners seek to achieve. Petitioners were entitled to adopt an estate plan which would decrease the amount of taxes they would otherwise owe, or avoid them altogether, by any means which the law permits. The decision depends rather upon "whether what was done, apart from the tax motive, was the thing which the statute intended," and whether in doing what they did petitioners have placed their transation within the net of another statutory provision, i.e., section 677. *Gregory v. Helvering*, 293 U.S. 465, 469 (1935).

In laying the facts of petitioners' case alongside the controlling statutory provisions, we are reminded that the substance of a transaction rather than the form in which it is cast is determinative of the tax consequences unless it appears from an examination of the statute that form is to govern. See, e.g., *Commissioner v. P. G. Lake, Inc.*, 356 U.S. 260, 266–267 (1958). This principle is peculiarly applicable to annuities and trusts because they are easily susceptible of manipulation so as to create illusion. Cf., e.g., *Knetsch v. United States*, 364 U.S. 361, 365–366 (1960) ; *Helvering v. Clifford*, 309 U.S. 331, 335 (1940) ; *Jack E. Golsen*, 54 T.C. 742, 754 (1970), affd. 445 F. 2d 985 (C.A. 10, 1971). "Technical considerations, niceties of the law of trusts or conveyances, or the legal paraphernalia which inventive genius may construct" must not frustrate an examination of the facts in the light of the economic realities. *Helvering v. Clifford, supra* at 334. Moreover, in ascertaining such realities, a series of related transactions may not be broken into bits and pieces but must be viewed as a whole. *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938) ; *Kanawha Gas & Utilities Co. v. Commissioner*, 214 F. 2d 685, 691 (C.A. 5, 1954).

A brief review of the essential facts will aid the analysis. In 1963, petitioners owned a valuable shopping center worth $1,575,000 which was producing substantial amounts of income. For a variety of reasons, they consulted their attorneys on the development of an estate plan which would provide for the disposition of their property.

In pursuance of the plan developed for them, petitioners, as grant-

---

[8] One of the conditions to the applicability of the section is that the distributions must not be subject to the approval of an adverse party. Quite clearly, the trustee was not an adverse party. *Flood v. United States*, 133 F. 2d 173, 176–177 (C.A. 1, 1943) ; *White v. Higgins*, 116 F. 2d 312, 318 (C.A. 1, 1940).

ors, created a trust for the benefit of their children and grandchildren, transferring to the trustee the sum of $1,000 and providing that additional amounts might be placed in the trust. Petitioners then transferred their shopping center to N & V, a corporation which they had recently organized, in exchange for its stock. Next, petitioners transferred their N & V stock to the trustee, and the trustee executed an "Annuity Agreement" whereby as trustee it was to pay petitioners or the survivor of them, as long as either of them shall live, the sum of $75,000 per annum.

It is stipulated that "Almost immediately after acquiring the stock of N & V, * * * [the trustee] sold it to World Entertainers Limited." The only reasonable inference is that this sale to World Entertainers was also prearranged. After preliminary discussions of the plan took place in February of 1962, the trustee, as stipulated, "consulted with its New York Counsel and its Nassau Counsel, after which a number of issues were raised," including an understanding that the trustee "would intend to dispose of the ownership of the shopping center almost at once." It is also stipulated that the trustee insisted that it "would as Trustee have a free hand to dispose of the shopping center corporation." In addition, the stipulation states:

> It was during all of these discussions running from February of 1962 through late 1963 when the annuity came into existence that Arawak [the trustee] determined that a Bahamian corporation that it represented and managed, World Entertainers Limited, would be interested in purchasing the shopping center when incorporated. [9]

Although it is stipulated that petitioners "did not take any part in such discussions and had no connection of any kind with World Entertainers Limited," the fact remains that the terms of the sale were arranged by the trustee, through the active participation of petitioners' attorney.[10]

---

[9] The use of the word "annuity" in this stipulation does not foreclose ascertainment of the substance of the transaction for the parties have stipulated: "It is understood by the parties that respondent's position is that the form of some of the transactions referred to herein may not represent the substance and legal effect of such transactions. Accordingly, it is agreed by the parties that no waiver, concession, or admission of ultimate facts shall arise against respondent by reason of the use herein of terms such as 'repurchased, owned, commitments of Lazarus Realty Co., annuity agreement, trust agreement, trustee, successor in interest,' and that respondent hereby reserves the right to argue the substance and legal effect of the transactions stipulated herein."

[10] The extensive involvement of petitioners' attorney, Harry Margolis, with the trustees and related organizations is described in stipulations of facts as follows:

"HARRY MARGOLIS and/or associates of his represented the trustors of approximately sixteen trusts established in the Bahamas in the year 1963. These trusts were located at ARAWAK, THE TRUST CORPORATION OF THE BAHAMAS LIMITED and the BANK OF NOVA SCOTIA TRUST COMPANY LIMITED. With the establishment of CAPITAL and its undertaking to manage the new trust company, ABC, these sixteen trusts were moved to ABC. At the present time Harry Margolis represents more than 150 ABC trustors. He is advised that this is more than any other single attorney."

The terms of the nonnegotiable promissory note given to the trustee by World Entertainers, summarized in our Findings, are highly unusual and are quite obviously tailored to the plan developed for petitioners. The note provides that World Entertainers will pay the trustee $1 million on January 1, 1984, and on or before June 1 of each year, beginning in 1964, will make annual payments of interest in the amount of $75,000. However, at any time on or before December 31, 1981, the trustee may elect to have a redetermination made of the principal of the note. On such election, the shopping center property will be reappraised as of 1 year from the date of the election, and the principal sum due under the note will be adjusted to a sum equal to the shopping center's appraised value, payable at the rate of $100,000 per year beginning 2 years after the demand for an appraisal. The interest payments are to be adjusted downward as the principal is paid.

Petitioners' premise that the $75,000 annual payments represent a "private annunity" is based on the language of the so-called annuity agreement. Their position is consistent with the language of that agreement if it is read alone. But the terms of a trust arrangement are not always limited to a single document labeled as a trust declaration. They may be found in several related instruments. *Ruth W. Collins*, 14 T.C. 301, 305 (1950), acq. 1950–2 C.B. 1; *Annie Louise Van Aken*, 35 B.T.A. 151, 159 (1936), acq. 1937–1 C.B. 26. The rule was stated long ago in *O'Meara* v. *Commissioner*, 34 F. 2d 390, 394 (C.A. 10, 1929), as follows:

> The declaration of trust need not be contained in the instrument which transfers the legal title. It may be set forth in a separate instrument or in several instruments, provided they are related to and connected with each other and, when construed together, establish the existence of the trust. * * *

This principle is applicable in the instant case. The trust arrangement was not limited solely to the trust agreement. The annuity agreement, pursuant to which the stock was transferred to the trust, was necessary to give the trust life; it was as much a part of the trust arrangement as the trust declaration itself. Similarly, the World Entertainers' note, which constituted the trust's corpus and was the only source of its income, was related to and connected with the other two instruments.

All these documents were executed pursuant to a prearranged plan. No one of them would have been signed without the other; each was dependent upon the other. In ascertaining the terms of the trust, therefore, both of the agreements between petitioners and the trustee, i.e., the trust declaration and the annuity agreement, must be read as if they were a single instrument. Their terms, together with the World

Entertainers' note, and all the pertinent facts and circumstances must be considered in deciding whether petitioners sold the N & V stock or transferred it in trust.

While these instruments were cast in the form of a sale in consideration for an annuity, they have the characteristics of a transfer in trust subject to a reservation of income. We think the trust characteristics of the transaction as a whole clearly predominate.[11] We base our decision on the *totality* of the following considerations:

(1) The simple fact is that the $75,000 which petitioners were to receive annually from the trust represented an amount equal to the interest payments to be received by the trust each year under the World Entertainers' note. Furthermore, that note called for no annual payments of principal unless the trustee elected to have the principal redetermined. Until that election was made, the annual trust distribution to petitioners represented the trust's income and, indeed, was its only income.[12]

The distributions during the years in issue could not have been made from corpus because the trust had no corpus except the World Entertainers' note (and the $1,000 in cash received on April 30, 1963). And the note could not be negotiated or sold piecemeal. It expressly provided that, prior to an election to accelerate its principal, no payment of principal could be required. Petitioners obviously did not intend to do anything to jeopardize the rights of their trust under the redetermination-of-principal provisions of the note. Thus, in each year before the Court, World Entertainers paid the trust the interest of $75,000, and the trust paid (distributed) an equal amount to petitioners.

(2) Since petitioners' receipts from the trust represented its interest income from World Entertainers, the principal of the note, the corpus of the trust, will remain intact for ultimate distribution to the remaindermen, petitioners' children and grandchildren. Under the terms of the note, for the period from June 1, 1964, through December 31, 1981, the trust will receive interest payments of $75,000 each year. As noted, this amount is equal to the sum to be distributed by the trust

---

[11] Under the argument on which we base our decision, respondent does not claim that petitioners realized any capital gain on the sale to World Entertainers. Therefore, we need not decide whether petitioners, in reality, made such sale with the trust serving as a conduit for the transfer of title, or if the trust, in fact, made a prearranged sale. Under either view, when the transactions were completed World Entertainers was to pay the trust $75,000 per year and petitioners were to receive the same amount from the trust.

[12] Ordinarily, the trust would bear all costs of administration without involving the grantor (trustor). However, the trust instrument executed by petitioners contains the following unusual provision: "The Trustee shall receive compensation and fees in accordance with its established terms, conditions and charges for its services, or as may be determined in writing from time to time between it and the Trustors."

to petitioners.[13] At the end of that 17-year period, or at any time during such period, the trustee may demand an appraisal of the shopping center assets, and under the note's redetermination-of-principal provisions the trust will receive, over an extended period, a sum equal to the then value of the shopping center property. Thus, the full value of the shopping center as of the appraisal date, undiminished by any payments to petitioners, will inure to the trust for the benefit of the objects of petitioners' bounty in precisely the same way as if petitioners had forthrightly cast the transaction in the form of a transfer in trust subject to a reservation of trust income.

(3) The arrangement did not give petitioners a downpayment, interest on the deferred purchase price, or security for its payment. It is almost inconceivable that a bona fide arm's-length sale, particularly a sale to a foreign entity, would be made on those terms. Such terms, however, are characteristic of a transfer in trust.

(4) The only source of the payments to petitioners was the income of the property which they transferred to the trust. Such an arrangement is alien to an arm's-length sale; it is characteristic of a transfer in trust.

(5) There is no relationship between the purported sale price and the value of the N & V stock. The absence of a provision for a downpayment, for interest on the deferred purchase price, or for security would ordinarily call for a premium sale price. Yet the actuarial value of the purported $75,000 annuity payments was only $864,533, compared with the N & V stock's stipulated value of $1,575,000; and the annuity agreement expressly declares that there is no gift element in the transaction. One ordinarily does not make an arm's-length sale of his property for a fraction of its value.[14] Cf. *Estate of A. E. Staley, Sr.*, 47 B.T.A. 260, 265 (1942), affd. 136 F. 2d 368 (C.A. 5, 1943). However, in the case of a transfer in trust, there is no necessary relationship

---

[13] As noted in our Findings, the trust's payments to petitioners were increased to a total of $105,000 per year beginning in 1968. Although the record is silent on the point, the election to have the principal of the World Entertainers' note redetermined was apparently made, because without such an election the trust could not have made the additional payments. When the shopping center is appraised, the payments to petitioners can still be made from income. There is no reason to think that the redetermined price would be less favorable to the trust than the $3 million plus regular interest of $750,000 received by AA from Branjon. A redetermined amount payable on such terms (or even less favorable terms) would produce large amounts of capital gains and interest which "may" be distributed to petitioners. This is all that is required for sec. 677 to apply. *Samuel v. Commissioner,* 306 F. 2d 682, 686 (C.A. 1, 1962), affirming 36 T.C. 641 (1961).

[14] Petitioners explain this discrepancy between the stock's value and the "sale price" on the ground that the tax savings—the capital gains tax on the sale of the stock, the income tax on annual receipts from investments of the sale proceeds, and estate tax at death of the first of petitioners to die—will more than offset the deficiency in the "sale price." This argument is supported by elaborate computations. In other words, we are told that petitioners should be allowed the tax savings they here claim because they entered into this transaction in order to obtain the benefit of such savings. Such an explanation does not show that the transaction was a bona fide sale.

between the present value of the right to the income and the value of the transferred property.[15]

(6) The annuity agreement declared, in substance, that the payments contained no element of interest; therefore, they constituted annuities only in the general sense that they were amounts to be paid each year to petitioners for the duration of their lives. Annuities in the tax sense, i.e., in the sense used in the Internal Revenue Code, include an element of interest. In *George H. Thornley*, 2 T.C. 220, 229 (1943), reversed on other grounds 147 F. 2d 416 (C.A. 3, 1945), this Court said:

The reports of the committees * * * [say] that "Payments to annuitants are, in fact, based upon mortality tables which purport to reflect a rate of return sufficient to enable the annuitant to recover his cost and in addition thereto a low rate of return on his investment." * * * [citation omitted], * * *:

"It is well known that an annuity is calculated to yield a recipient who lives out his expectancy a total amount equal to the consideration paid, plus interest thereon. Hence, each annual payment, from the actuarial point of view, is made up partly of a return of capital and partly of income."

See also *J. Giltner Igleheart, Sr.*, 10 T.C. 766, 769–770 (1948), affd. 174 F. 2d 605 (C.A. 7, 1949); *Glenn E. Edgar*, 56 T.C. 717, 742–743 (1971); cf. sec. 1.72–1(c)(1), Income Tax Regs. The absence of an interest factor is inconsistent with petitioners' annuity theory but is wholly consistent with our conclusion that the $75,000 annual payments constituted reserved trust income.

For all these reasons, we do not think petitioners sold their N & V stock to the trust in exchange for an annuity. Rather, we think that stock was transferred to the trust and sold to World Entertainers, with the understanding that petitioners reserved the right to receive from the trust a sum equal to the interest payable on the World Entertainers' note. In a real sense, the trust served merely as a conduit. See *Bettendorf* v. *Commissioner*, 49 F. 2d 173 (C.A. 8, 1931); *Shellabarger* v. *Commissioner*, 38 F. 2d 566 (C.A. 7, 1930); *Willard S. Heminway*, 44 T.C. 96 (1965); *Fremont C. Peck et al., Executors*, 31 B.T.A. 87 (1934), affd. 77 F. 2d 857 (C.A. 2, 1935), certiorari denied 296 U.S. 625 (1935). While the trust instrument contains various conditional provisions on the distribution of trust income to petitioners' children and grandchildren, the distributions called for in the annuity agreement were not conditioned in any way. We think they were to

---

[15] The significance of the absence of a downpayment in a sale transaction in relation to the price is illustrated by the consideration received by AA from Branjon on the sale of the N & V stock on Apr. 6, 1964, only about 4 months after petitioners' alleged sale to the trust. Branjon agreed to pay $3 million (consisting of the agreed value of $1,575,000 plus capitalized interest of $1,425,000) plus "regular interest of $750,000" for the N & V stock. It is stipulated that, in that transaction, "The advantages to Branjon arose out of the no down payment requirement, excess depreciation potential and the opportunity for inflationary growth with great leverage."

come ahead of all the others. Certainly this was the practical interpretation given the two instruments by the parties. Cf. *Estate of Marvin L. Pardee*, 49 T.C. 140, 148 (1967).

There is no merit in petitioners' argument that a debtor-creditor rather than a fiduciary relationship was created merely because the amount of the annual payments was specified. To so hold would exalt form above reality. When the crucial documents were signed, both petitioners and the trustee knew the trust's only income would be the annual interest payments of $75,000 from World Entertainers, and those same amounts were to be paid (distributed) to petitioners. In other words, they all "fully understood what was going on." *Estate of Cornelia B. Schwartz*, 9 T.C. 229, 240 (1947), acq. 1947–2 C.B. 4. Quite obviously, if a grantor transfers property to a trust and the trust is obligated to pay him for the duration of his life the income or a stated fraction of the income produced by the property, he has not purchased an annuity. He has reserved the income, *Sallie Cosby Wright*, 38 B.T.A. 746, 752 (1938); *Annie Louise Van Aken, supra* at 157–158; *Michael Fay et al., Executors*, 34 B.T.A. 662, 667 (1936); see also *Lorenz Iversen*, 3 T.C. 756, 773–774 (1944), and he remains the equitable owner of the property. Cf. *Blair* v. *Commissioner*, 300 U.S. 5, 13 (1937). We see no practical difference between a grantor's reservation of a trust's income and his reservation of a sum precisely equal to the precisely calculable future income of the trust.[16]

Moreover, we do not think the amounts distributed to petitioners were even intended to exceed the trust's income. We reach this conclusion not only because the trust's annual interest income was to be precisely equal to the amounts to be distributed to petitioners but also because, as noted, the corpus of the trust, the World Entertainers' note, as a practical matter, could not be used to make the payments to petitioners. Thus, if for some reason, the trust income was insufficient, there was no source from which the $75,000 payments could be made. We think the only reasonable inference is that the parties contemplated that, if the trust did not have income sufficient in any year to

---

[16] Several authors have suggested that an arrangement calling for the payment to a grantor of a sum approximately equal to the trust's income is not an annuity for income, gift, or estate tax purposes but, rather, is a reservation of trust income. See, e.g., Moss, "Estate and Gift Tax Consequences of Intra-Family Annuities," 5 Syracuse L. Rev. 46, 48 (1953); Kassoy, "The Private Annuity and the Foreign Situs Trust," 16 U.C.L.A. L. Rev. 111 (1968–1969); Comment, "Latest Developments in the Tax Treatment of Private Annuity Transactions," 47 Tex. L. Rev. 1416 (1969); cf. Wallace, "Taxation of Private Annuities," 40 Boston U. L. Rev. 361–362 (1960). The Commissioner has adopted the same position in Rev. Rul. 68–183, 1968–1 C.B. 308. State courts faced with determining whether a transfer to a trust constituted a "sale" or a transfer in trust with the retention of income have reached a similar result. See, e.g., *In re Stevens' Estate*, 163 Cal. App. 2d 255, 329 P. 2d 337, 343–344 (1958); *In re Hyde's Estate*, 92 Cal. App. 2d 6, 206 P. 2d 420, 426–428 (1949); *In re Estate of Lichtenstein*, 52 N.J. 553, 247 A. 2d 320, 333 (1968); *Darr* v. *Kervick*, 31 N.J. 476, 158 A. 2d 42, 45–47 (1960); *In re Kellogg's Estate*, 123 N.J. Eq. 322, 197 Atl. 263, 264 (Prerog. Ct. 1938).

make the full payment to petitioners, the amounts of the distributions would be reduced accordingly. See *Samuel* v. *Commissioner*, 306 F. 2d 682 (C.A. 1, 1962), affirming 36 T.C. 641 (1961) ; *Updike* v. *Commissioner*, 88 F. 2d 807 (C.A. 8, 1937), certiorari denied 301 U.S. 708 (1937) ; *Estate of Cornelia B. Schwartz, supra; Tips* v. *Bass*, 21 F. 2d 460 (W.D. Tex. 1927).

Petitioners place their main reliance upon what they refer to as the "celebrated" cases of *Commissioner* v. *Kann's Estate*, 174 F. 2d 357 (C.A. 3, 1949) ; *J. Darsie Lloyd*, 33 B.T.A. 903 (1936) ; and *Hill's Estate* v. *Maloney*, 58 F. Supp. 164 (D. N.J. 1944), dealing with so-called private annuities. In each of those cases, an elderly individual transferred his property to one or more family members in exchange for the latter's promise to make fixed annual payments for the duration of the transferor's life. Relying upon *Burnet* v. *Logan*, 283 U.S. 404 (1931), the courts held that no capital gain was realized in the year of the exchange because the promise to make future payments was not subject to valuation. *Kann's Estate* and *Lloyd* dealt with only the year of sale and did not consider the taxation of the annual payments; *Hill's Estate* reached the same conclusion on the year of sale and, in addition, held that the annual payments were taxable, in part, to the transferor as an annuity under the formula prescribed by the predecessor of section 72.

Those cases, each involving a disposition of property within a family group in return for a personal undertaking to make annual payments, provide a sharp contrast with the present one where an entity, the foreign trust, was created specifically to channel the World Entertainers' interest payments to petitioners. That a transaction is clothed with the paraphernalia of a so-called private annuity does not exempt it from the same kind of hard legal analysis that any other type of transaction receives. And, for the reasons stated, we think the transaction here involved created a fiduciary relationship. Indeed, we think no private annuity would have been created even if, assuming all the other facts were the same, petitioners had made the transfer to their children and grandchildren rather than to a trust. In such circumstances, the children and grandchildren would have been mere conduits to petitioners, as was the trust in this case, of the interest paid by World Entertainers.

The factual situation here presented is analogous to *Samuel* v. *Commissioner, supra*, where Samuel, in 1951, transferred the Dead Sea Scrolls in trust, reserving to himself all the income therefrom and 90 percent of the principal for life. In 1952, Samuel amended the trust, directing the trustees to make annual payments to him of $10,000 from income or principal, for life, and upon his death to make certain other

payments. He contended that the $10,000 payments were consideration for a sale of the scrolls to the trust. Pointing out that the only source of the payment was the property which Samuel transferred and its income, the court rejected the annuity argument, holding that the transaction was a transfer in trust which fell within section 677(a), as follows (p. 688):

> While, as petitioner contends, it may be legally permissible for a settlor to be the creditor of a trust, here there was, in effect, but a single transaction. In short, the transfer, which petitioner contends established him as a creditor of the trust, was the very foundation of the trust itself. The transfer which the petitioner views as a sale to the trust was, in reality, the same transfer which created the trust.

See also the instructive reasoning in *Staley* v. *Commissioner*, 136 F. 2d 368, 369–370 (C.A. 5, 1943), affirming 47 B.T.A. 260 (1942); cf. *Sheaffer's Estate* v. *Commissioner*, 313 F. 2d 738, 742 (C.A. 8, 1963), affirming 37 T.C. 99 (1961), certiorari denied 375 U.S. 818 (1963).

Petitioners attempt to distinguish *Samuel* as involving "a *totally* ill-planned and ill-executed transaction" which Samuel attempted "after the fact" to recast as a "protected sale-annuity contract." Petitioners emphasize in contrast the technical elegance of the papers documenting their transaction. But the Court of Appeals did not limit its analysis of *Samuel* to such formalities. The court looked at the substance of the entire set of facts as constructed by Samuel. It then concluded that he had reserved the trust income and that, consequently, the transaction fell within section 677(a).

*Becklenberg's Estate* v. *Commissioner*, 273 F. 2d 297 (C.A. 7, 1959), on which petitioners also rely, involved a different issue, different statutory provisions, and different facts. In that case, involving estate taxes, decedent transferred property to a trust which was to be liquidated, and the proceeds were to be used to purchase commercial annuities for the decedent and members of her family. As a temporary substitute, pending the purchase of the annuities, the trust was to pay decedent $10,000 per year; she died before the annuities were bought. The Commissioner sought to include the trust proceeds in decedent's estate under the provisions of the predecessor of section 2036 as a transfer with a retained right to the income thereof. The Court of Appeals, reversing 31 T.C. 402 (1958), held that the decedent had an absolute right to the $10,000 annual payments and that there was no reservation of income. Significantly, the $10,000 payments could have been made from the 73 percent of the assets of the trust not contributed by the decedent. In other words, other assets were available to make her annual distributions from the trust. Had the purchase of the commercial annuities been completed, nothing would have been includable in the decedent's estate; the Court of Appeals apparently felt that the re-

sult should not be different merely because of the untimeliness of decedent's death. See also the discussion of *Becklenberg's Estate* in *Samuel* v. *Commissioner, supra* at 689.

We hold that, in the years before the Court, the interest income of the trust of which petitioners were the grantors, in substance, was distributed to them. They reserved the right to that income when the N & V stock was transferred to the trust. Petitioners are, therefore, treated as owners of all, or a portion of, the trust within the meaning of section 677(a) and are taxable on such income under section 671.

## 2. *Gift Tax Liabilities*

From our conclusion that petitioners did not sell their N & V stock to the trust but, rather, transferred it to the trust, reserving $75,000 per year of the income thereof, it follows that petitioners made a gift to the trust of the remainder interest in the stock. *Bowden* v. *Commissioner*, 234 F. 2d 937 (C.A. 5, 1956), affirming a Memorandum Opinion of this Court, certiorari denied 352 U.S. 916 (1956). The value of the gift and the amount of the gift tax will be the subject of the Rule 50 computation.

## 3. *Lease Deposits*

As detailed in our Findings, sometime prior to the transfer of the shopping center to N & V, petitioner had received deposits of funds from lessees to secure due performance under certain leases. When the shopping center was transferred to N & V, petitioner retained these sums. However, when he settled his dispute with Branjon in 1967, petitioner paid over these amounts to that corporation. Notwithstanding petitioner's repayment of these funds in 1967, respondent has determined that petitioners realized gain in 1963 on the theory that N & V assumed the obligation to account for the lease deposits.

We see no merit in respondent's position. All except one of these leases were entered into in years prior to 1963. If petitioner ever acquired an unrestricted right to these funds, it would seem that he did so when the deposits were made; if so, he realized income at that time. Furthermore, the instruments documenting the shopping center's transfer to N & V do not suggest that N & V obligated itself to account for the deposits. To the contrary, after the shopping center was transferred to N & V, Lazarus continued to manage it under a contract whereby payment of the rents under the various leases was guaranteed. In such circumstances, it was perfectly reasonable that such deposits would not be transferred to N & V. That petitioner was required to pay them over to Branjon in 1967 indicates that petitioners acquired no new rights to these funds in 1963.

We conclude that nothing occurred in 1963 which rendered the lease deposits taxable to petitioners.

### 4. *Interest Deduction Issue*

In the notice of deficiency, respondent disallowed interest deductions of $35,327 and $38,830 for 1964 and 1965, respectively. He does not deny that interest payments in these amounts were made on indebtedness which N & V did not assume when the shopping center was transferred to it. In disallowing such deductions, respondent was proceeding under his alternative position that the transaction here in question involved the acquisition of an annuity. He was relying upon Section 264(a)(2) which provides that no deduction shall be allowed for any amount paid on indebtedness incurred to purchase or carry an annuity.

Respondent's theory for disallowing these deductions does not apply if, as we have held, the transaction was a transfer in trust rather than the purchase of an annuity. He offers no argument to the contrary. Accordingly, we hold that petitioners are entitled to the claimed interest deductions.

To reflect all the foregoing conclusions,[17]

*Decisions will be entered under Rule 50.*

---

[17] Since petitioners acted on advice of counsel, the additions to tax under sec. 6651(a) do not apply.