FRANK R. AND GINA BODOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bodor v. Commissioner
Docket No. 14339-91
United States Tax Court
T.C. Memo 1993-456; 1993 Tax Ct. Memo LEXIS 466; 66 T.C.M. (CCH) 928; September 29, 1993, Filed *466 Decision will be entered under Rule 155. For petitioners: Edward G. Ptaszek. For respondent: J. Scott Broome. COUVILLION
COUVILLION
MEMORANDUM OPINION COUVILLION, Special Trial Judge: This case was heard pursuant to section 7443A(b)(3) [1] and Rules 180, 181, and 182. Respondent determined a deficiency in petitioners' 1987 Federal income tax in the amount of $ 1,170.74 and additions to tax under section 6653(b)(1)(A) of $ 878.06 and section 6653(b)(1)(B) of 50 percent of the interest payable that portion of the underpayment attributable to fraud. The issues for decision are: (1) Whether petitioners are entitled to deduct as rental expense under section 162(a)(3) $ 10,000 paid pursuant to a transfer-leaseback of real estate, and (2) whether petitioners are liable for the additions to tax for fraud. Some of the facts were stipulated and are found *467 accordingly. The stipulation and attached exhibits are incorporated herein by reference. Petitioners, husband and wife, resided in Warren, Ohio, at the time they filed their petition. Frank R. Bodor (petitioner) is an attorney and was engaged in the general practice of law during 1987. He had practiced law for 28 years. Petitioner did not hold himself out as a tax lawyer but had, on occasion, represented clients before the Internal Revenue Service (IRS) and had prepared some income tax returns. Petitioner Gina Bodor (Mrs. Bodor) had a college degree with a foreign language major. At various times throughout 1987, Mrs. Bodor worked at petitioner's law office. At the beginning of 1985, petitioners owned the following parcels of real property: (1) 157 Porter Street, N.E., Warren, Ohio (two-story building with petitioner's law office on the first floor and two rental apartments on the second floor); (2) 165-167 Porter Street, N.E., Warren, Ohio (apartment building); (3) 156 Scott Street, Warren, Ohio (apartment building); (4) 177 Porter Street, N.E., Warren, Ohio (residential rental house); (5) 4950 Gulf Boulevard, St. Petersburg Beach, Florida (the Florida condominium); (6) 609 *468 Melwood Drive, Warren, Ohio (petitioners' residence); (7) vacant lot on Porter Street, Warren, Ohio; and (8) 130 South Center Street, Newton Falls, Ohio. By written instruments dated April 30, 1985, all of petitioners' interests in the eight properties were deeded by quitclaim to various foreign entities as follows: Parcel 1 to Etruscan Lease Company, Nassau Life Insurance Company, Ltd., Trustee (Etruscan-Nassau). Parcels 2, 3, 4, 5, 7, and 8 to Nile Management Company, Nassau Life Insurance Company, Ltd., Trustee (Nile-Nassau). Parcel 6 to Attila Company, Nassau Life Insurance Company, Ltd., Trustee (Attila-Nassau). In addition to their real estate, petitioners also transferred title to several motor vehicles to one or more of these entities. The quitclaim deeds were signed by petitioners as grantors. In addition, there was a "Condominium Resale Approval" executed on May 6, 1985, for Parcel 5, in which the purchaser was listed as "Nile Co., Nassau Life Insurance Co., Ltd., Trustee, Frank R. Bodor, Pres.", and the document was signed for Nile-Nassau only by Frank Bodor, Agent". The address recited for the entity was 157 Porter Street, petitioner's law office. The documents *469 effecting the transfers and the supporting board minutes relating to Etruscan-Nassau, Nile-Nassau, and Attila-Nassau appear to be preprinted forms and were virtually identical. Each was dated February 28, 1985, and the entities were each referred to as a "Business Trust Organization" contractually created "under the laws of the Turks and Caicos Islands, British West Indies". In consideration for the transfer of their real and personal properties, petitioners received 99 of 100 "Unit Capital Certificates" in each entity. In 1985, other than petitioners' signatures, the only pertinent signature on the foreign entity documents was that of Robert Chappell as president of Nassau Life Insurance Company, Ltd., Trustee (Nassau Life). For each of the three foreign entities named above, there were board minutes which appointed petitioner as "President (Agent)" and Mrs. Bodor as "Secretary (Agent)". The documents provided that petitioners were to act only as authorized by Nassau Life. In connection with petitioners' transfers of their properties, two lease agreements were entered into between Nile-Nassau and Etruscan-Nassau, as lessors, and petitioners, as lessees. In the first lease, *470 petitioners leased Parcels 1 through 5 for the period from March 1, 1985, to December 31, 1985, for a rental of $ 33,500 to be paid by petitioners by the end of 1985. The second lease also involved Parcels 1 through 5 for the year 1986 and provided for a rental of $ 20,000 for that year. Although the lease for 1985 covered the period from March 1, 1985 to December 31, 1985, the quitclaim deeds by which the properties were transferred to the foreign entities are dated 2 months later, April 30, 1985. The second lease agreement was executed only by Nile-Nassau as lessor, although the record indicates that Parcel 1 had been transferred to Etruscan-Nassau. Etruscan-Nassau was not a party to the 1986 lease agreement. Throughout 1985 and 1986, as well as the year at issue, 1987, petitioners remained in possession of their properties in the same fashion as they had prior to the transfers to the foreign entities. Due to illegal activities, in late 1986 or early 1987, Nassau Life Insurance Company ceased operations. Petitioners knew that the problems of Nassau Life stemmed from illegal activities and a "tax situation". Since Nassau Life ceased operations, other arrangements had to be *471 made for petitioners' property. By the end of 1987, legal title to all parcels of property which had been held by Nassau Life as Trustee, with the exception of Parcel 5, was transferred to R.E. Services, Inc., as "Land Trustee" pursuant to a "Title Holding Trust Agreement". [2] In this agreement, R.E. Services, Inc., held legal title for the benefit of an entity known as Compass Group, Oxford Charter Corporation, Trustee (Compass-Oxford). In June 1987, Parcel 5 was deeded directly by Etruscan-Nassau to Compass-Oxford. The Compass-Oxford entity, therefore, held beneficial title to seven parcels of petitioners' property and legal title to one parcel. The warranty deeds and the holding agreement were all prepared by petitioner. According to documents dated March 1987, Compass Group was created as a Delaware common-law contractual company *472 with Oxford Charter Corporation, a Delaware corporation, serving as trustee. The only mailing address given for Compass-Oxford on these documents was 157 Porter Street, N.E., Warren, Ohio 44483, petitioner's law office. In addition, petitioner was agent/general manager and Mrs. Bodor was secretary for Compass-Oxford. Petitioners opened Compass-Oxford's only bank account in a local bank, and they were the only individuals who had signatory authority on this account. There were 100 Compass-Oxford ownership units authorized, and these units were held by Lido Company, Jefferson Trust Company, Ltd., Trustee (Lido-Jefferson). Both Lido and Jefferson were foreign entities organized under the laws of the Turks and Caicos Islands, British West Indies. Robert Temple, an associate of petitioner, had signatory authority on the Lido-Jefferson bank account in Warren, Ohio. The address for Lido-Jefferson for its bank account was 157 Porter Street, petitioner's law office. There were 100 Lido-Jefferson ownership units authorized, and these units were held entirely by Concord Company, Eton Trust Company, Ltd, Trustee (Concord-Eton). Both Concord and Eton were foreign entities organized under *473 the laws of the Turks and Caicos Islands, British West Indies. Petitioners had signatory authority on the Concord-Eton bank account, and the bank's mailing address for this account was 157 Porter Street, petitioner's law office. In 1987, petitioners surrendered the "Unit Capital Certificates" they had received in 1985, when they quitclaimed their properties to the foreign trusts, and in exchange for their Unit Capital Certificates received 100 ownership units of Concord-Eton, with 50 units in the name of each petitioner. Petitioners later transferred these ownership units to their two minor children with petitioners as custodians. In summary, therefore, by the end of 1987, all of petitioners' real and personal properties were titled in Compass-Oxford, as beneficial or legal owner. Compass-Oxford was owned by Lido-Jefferson. Lido-Jefferson was owned by Concord-Eton, and Concord-Eton was owned by petitioners as custodians for their two children. For the year 1987, petitioners entered into a lease with Compass-Oxford, as lessor, for Parcels 1 through 5. For the five properties, petitioners agreed to pay a rental of $ 10,000 on or before December 31, 1987. As noted earlier, Parcels *474 1 through 5 included petitioner's law office, the rental properties in the vicinity of the law office, and the Florida condominium. The record is silent as to the reasons for the disparities in the rents petitioners agreed to pay for these properties for 1987 compared to the $ 20,000 they agreed to pay for 1986 and the $ 33,500 they agreed to pay for 10 months of 1985. The lease was to continue indefinitely "until terminated by either party". As part of the lease, petitioners were to pay all taxes, assessments, licenses, and inspection fees on the leased properties and were responsible for all inside and outside repairs or maintenance. In a second lease, petitioners leased their personal residence from Compass-Oxford for $ 1,500 per year. All of the bank accounts for the relevant entities were opened on December 29, 1987. Pursuant to the 1987 lease of Parcels 1 through 5, as discussed previously, on December 30, 1987, petitioner issued two checks out of his personal law practice account, totaling $ 10,000, to Compass-Oxford. Both checks were deposited into the Compass-Oxford account on December 30, 1987, and were honored. This money was distributed to Lido-Jefferson by two *475 $ 5,000 checks, dated December 29 and December 30, 1987, drawn on the Compass-Oxford account and signed by petitioner. These checks were then deposited into the Lido-Jefferson account on December 30, 1987. There were no other deposits to or distributions from the Compass-Oxford account from December 29, 1987, to November 30, 1988. On December 30, 1987, two checks of $ 3,500 and $ 6,500 were drawn on the Lido-Jefferson account, signed by Robert Temple. However, except for the signature of Mr. Temple, both checks appear to have been prepared by petitioner. These checks, totaling $ 10,000, were deposited into the Concord-Eton account on December 30, 1987. The only other activity in the Lido-Jefferson account was a deposit on December 30, 1988, from an unknown source, and on the same day a check was made payable to Concord-Eton for approximately the same amount. From December 1987 through September 1989, there were deposits to the Concord-Eton account which totaled $ 33,717.84. Of that amount, $ 10,000 can be traced from petitioners. The source of the balance is unknown. Petitioners directly received $ 19,600 of those funds through four checks made out to Frank Bodor or Gina *476 Bodor in 1988 and 1989. In addition, an account in the name of Adena Enterprises, Oxford Charter Corporation, Trustee (Adena-Oxford), received $ 13,697 of the Concord-Eton funds in 1988 and 1989. Petitioners also opened the Adena-Oxford account and had sole signatory authority on that account. All of the ownership units of Adena-Oxford were held by Lido-Jefferson, and the ownership units of Lido-Jefferson were held by Concord-Eton, the latter of which, as noted above, was owned by petitioners as custodians for their two children. Petitioners explained the transfers from the Concord-Eton account as loans made to petitioner and Adena-Oxford. On their 1987 Federal income tax return, petitioners reported the income and expenses relating to Parcels 1 through 5, which they leased from Compass-Oxford. The income and expenses from these properties were reported on Schedule E of petitioners' return as income and expenses from rental activities. The five properties were separately identified on Schedule E by street number. The income consisted of rents petitioners received from subleases of the apartments and offices and the Florida condominium. Included in the expenses was the $ 10,000 *477 petitioners paid Compass-Oxford for rent pursuant to the lease of the five properties. The properties listed on Schedule E did not include petitioners' residence, nor did petitioners claim as a deduction the $ 1,500 for rental of their residence. The Schedule E properties, however, did include the Florida condominium (Parcel 5), from which petitioners reported $ 3,600 rental income and, as to which, a portion of the $ 10,000 rental expense was claimed as a deduction. In the notice of deficiency, respondent made only one adjustment to petitioners' 1987 return. That adjustment was the disallowance of the $ 10,000 rental expense claimed for the five properties. Respondent's position is that petitioners were the owners of these properties, and that the transfers or quitclaim deeds wherein petitioners transferred their properties to the foreign entities were shams and, therefore, were without economic effect. In lieu of a rental expense deduction, respondent allowed a depreciation deduction on three of the properties, totaling $ 1,927.96. At trial, the parties stipulated that, in the event the Court sustained respondent on this issue, petitioners were entitled to depreciation deductions *478 on four of the properties, totaling $ 2,815.97. Respondent did not stipulate to a depreciation deduction for the Florida condominium; however, the parties agreed to the depreciable basis and the depreciable rate in the event the Court finds petitioners are otherwise entitled to a depreciation deduction for this property. Respondent made no adjustments to any of the other income and expense items reported on Schedule E or any other items on petitioners' 1987 return, except for a computational adjustment of petitioners' Schedule A medical expenses. In the stipulation, the parties agreed that, for 1987, the aggregate fair market rental value of Parcels 1 through 5 was not less than $ 10,000, and "the rental value of those properties is not in dispute". On June 1, 1990, petitioner was contacted by Carl Gentile, an IRS agent who was to audit petitioners' 1987 income tax return. At that time, a meeting was scheduled for August 8, 1990. On June 4, 1990, Agent Gentile mailed to petitioners a standard form information document request (IDR) which requested various documents, including copies of petitioners' bank statements, canceled checks, and deposit slips as to all bank accounts "which *479 you maintained * * * or over which you had signature authority." On August 8, 1990, petitioner met with Agent Gentile as scheduled. Petitioner brought with him copies of the two canceled checks to Compass-Oxford totaling $ 10,000, which represented the real estate rental expense deduction claimed on Schedule E of petitioners' 1987 return. Petitioner did not present a copy of the lease; however, at the request of the agent, petitioner agreed to submit a copy of the lease. In addition, petitioner did not mention or bring any documents regarding the various accounts over which petitioners had signature authority. From the questions asked by Mr. Gentile, it was obvious that the focus of his audit would be on petitioners' involvement with the foreign trusts. On August 8, 1990, Agent Gentile prepared and gave petitioner another handwritten IDR requesting information related to petitioners' involvement with Nassau Life and the Compass-Oxford lease. This request was much more specific than the standard form IDR sent on June 4, 1990. The information requested was to be returned by August 17, 1990. Agent Gentile did not receive any further information prior to August 22, 1990, when *480 he telephoned petitioner with additional questions. In response to those questions, petitioner stated that Compass-Group owned the properties which he and his wife leased and which they subleased to other tenants. Petitioner admitted he had signature authority over the Compass-Oxford bank account, which he could exercise only with the trustee's permission. When asked how he would get permission from the trustee, petitioner answered he did not know. Mrs. Bodor, as the designated secretary of Compass-Oxford, Adena-Oxford, and Concord-Eton, received and reconciled the bank statements of these entities; however, petitioners never provided Agent Gentile with copies of the lease involving the five properties, bank statements, canceled checks, or deposit slips for the accounts of Compass-Oxford, Adena-Oxford, Lido-Jefferson, or Concord-Eton. Subsequently, in September 1990, Agent Gentile summonsed and received the bank records of Compass-Oxford and discovered that distributions were made to Lido-Jefferson by checks signed by petitioner. Thereafter, in order to trace the funds from Lido-Jefferson, Agent Gentile issued a summons to the bank where the Lido-Jefferson account was located. *481 Pursuant to a petition to quash the summons, filed in the names of Lido-Jefferson and petitioners, a hearing was held in the United States District Court for the Northern District of Ohio in Akron, Ohio, on July 8, 1991. The challenge to the summons was unsuccessful. Petitioners provided no further documentation to the IRS agent. On December 10, 1990, Mr. Gentile called petitioner and advised him that the $ 10,000 rental expense claimed on Schedule E of their 1987 return would be disallowed, and that respondent would assert the additions to tax for fraud under section 6653(b). The first issue is whether petitioners are entitled to a deduction of $ 10,000 claimed as real estate rental expense on Schedule E of their 1987 income tax return for the five properties which petitioners transferred to the foreign trusts. Respondent determined that the $ 10,000 was not allowable as a deduction for the reason that the transfers by petitioners to the "trusts" were sham transactions and had no economic substance. Petitioners contend the transfers were valid and should be recognized for tax purposes. They assert that their purpose in transferring their properties was to shield them from *482 liability to third parties, which they feared could arise out of petitioner's law practice. Thus, petitioners contend their lease of these properties should be recognized, and the rental payments should be held to be deductible. As noted earlier, respondent agrees that, in lieu of a rental deduction, petitioners are entitled to a depreciation deduction on four of the five properties involved. With respect to the deficiency in tax, the determinations by respondent in a notice of deficiency are presumed correct, and the burden of proof is on the taxpayer to prove that the determinations are in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). A fundamental principle of income tax law is that economic substance prevails over form. Gregory v. Helvering, 293 U.S. 465 (1935). In order to support a deduction, the requisite "payment" must be one in substance, not merely in form, and must be made to an entity with economic substance which is recognized for Federal tax purposes. Professional Services v. Commissioner, 79 T.C. 888 (1982). "When the form of the transaction has not in *483 fact altered any cognizable economic relationships, we will look through that form and apply the tax law according to the substance of the transaction." Zmuda v. Commissioner, 79 T.C. 714, 720 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). This rule applies regardless of whether the entity has a separate existence recognized under State law and whether, in form, it is a trust, a common-law business trust, or some other form of jural entity. Id.; Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). As stated in Lazarus v. Commissioner, 58 T.C. 854, 864 (1972), affd. 513 F.2d 824 (9th Cir. 1975), "Technical considerations, niceties of the law of trusts or conveyances, or the legal paraphernalia which inventive genius may construct" must not frustrate an examination of the facts in light of the economic realities. Helvering v. Clifford, 309 U.S. 331, 344 (1940). Moreover, "sham transactions" having no economic effect cannot be recognized for tax purposes. *484 Sandvall v. Commissioner, 898 F.2d 455, 458 (5th Cir. 1990) (quoting Thompson v. Commissioner, 631 F.2d 642, 646 (9th Cir. 1980), affg. T.C. Memo. 1989-56 and T.C. Memo. 1989-189. The Court finds the transactions between petitioners and the entities described above are without economic substance. It is clear that there were no independent trustees functioning in a fiduciary role with regard to Compass-Oxford, Lido-Jefferson, Concord-Eton, or Adena-Oxford. In actuality, petitioners directed the creation and operation of the entities which, on paper, held title to the properties at issue. Neither petitioners' self-serving testimony nor the preprinted forms and certificates presented to the Court change this conclusion. Petitioners were the only individuals who acted for the entities with the exception of Robert Temple. The Court finds that the checks were signed by Robert Temple for Lido-Jefferson only as a formality pursuant to petitioners' overall plan. On all bank accounts, petitioners' law office was listed as the entities' address, and Mrs. Bodor reconciled *485 all of the bank statements. Petitioners always remained in possession of the properties and controlled the properties as they had done before the transfers. Once the Court looks through the layers of paper creating the tier structure of the domestic and foreign trust shell entities through which the funds were channeled, no economic relationships were altered, and petitioners or their minor children remained the owners of the properties involved. Payments to "economic nullities" are not contemplated by section 162. Markosian v. Commissioner, 73 T.C. 1235, 1245-1246 (1980). Furthermore, as the true owners of the equity in the properties, petitioners could not "lease" the properties from themselves. See sec. 162(a)(3). The Court agrees with respondent's determination that the transfers by petitioners were shams and had no economic effect. Thus, petitioners are not entitled to claim $ 10,000 as a real estate rental expense deduction on their 1987 income tax return. Respondent, therefore, is sustained on this determination. Nevertheless, as owners of property held for rental, and for that portion of the property used by petitioner as his law office, *486 petitioners are entitled to deductions for the related depreciation of the properties. It was stipulated, and the Court agrees, that, since "petitioners are deemed to be owners of" Parcels 1, 2, 3, and 4, petitioners are entitled to depreciation deductions of $ 1,091.49, $ 410.36, $ 426.12, and $ 888, respectively, for 1987. As to Parcel 5, the condominium located at 4950 Gulf Boulevard, St. Petersburg Beach, Florida, the stipulation set forth the cost basis of the property, the date it was acquired, and the straight-line depreciation rate of the property. Respondent did not stipulate that petitioners would be entitled to a depreciation deduction for this property for 1987. Respondent's position is that petitioners are not entitled to a depreciation deduction because the requirements for deductibility under sections 167 and 280A have not been satisfied. The notice of deficiency did not disallow other expenses claimed by petitioners with respect to this property except for the claimed rental expense. Petitioners reported $ 3,600 rental income from this property for 1987 and claimed expenses of $ 6,858.07, exclusive of the rental expense. On this record, the Court finds that *487 petitioners satisfied the requirements of sections 167 and 280A, and, accordingly, petitioners are entitled to a depreciation deduction for 1987 with respect to their Florida condominium. [3]
The other issue is whether petitioners are liable for additions to tax for fraud under section 6653(b)(1)(A) and (B) for 1987. Respondent bears the burden of proving fraud *488 by clear and convincing evidence. Rule 142(b); sec. 7454(a). Respondent's position is that petitioners fraudulently made false or misleading statements, attempted to conceal their assets through their involvement with the tiered foreign-based trust structure, back-dated documents, and failed to cooperate with taxing authorities. Petitioners' position is that the primary motive in transferring their properties into trusts was to protect their assets from potential tort and legal malpractice claims; that no actions were taken to conceal or misrepresent information to the IRS; that all relevant information was presented on their 1987 income tax return, including reported rental income; and that the transfer and leaseback transactions were entered into without any consideration for the tax effect.
Fraud exists only when (1) there is an underpayment of taxes, and (2) the taxpayer knowingly underpaid the taxes with the specific intent to evade a part of the taxes underpaid. Wright v. Commissioner, 84 T.C. 636, 639-643 (1985). Thus, in order to prove that an underpayment is due to fraud, respondent must show that the taxpayer intended to evade a tax known *489 to be due by conduct designed to conceal, mislead, or otherwise prevent the collection of such tax by respondent. Patten v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148; Recklitis v. Commissioner, 91 T.C. 874, 909 (1988). The existence of fraudulent intent is a factual question to be decided on the basis of an examination of the entire record. Recklitis v. Commissioner, supra at 909; Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980). It may never be presumed but must be established by affirmative evidence. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Because direct proof of a taxpayer's intent is rarely available, however, fraud may be established by circumstantial evidence. Grosshandler v. Commissioner, supra at 19; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). However, a finding of fraud cannot be based upon *490 circumstantial evidence which creates merely a suspicion of fraud. Carter v. Campbell, 264 F.2d 930, 935 (5th Cir. 1959); Beaver v. Commissioner, supra.
In considering the existence of fraud, the courts have identified certain so-called badges of fraud which are indicative of culpable behavior. These badges include: (1) An understatement of income; (2) maintaining inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; (6) failure to cooperate with tax authorities, Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; (7) making false or inconsistent statements to revenue personnel, Grosshandler v. Commissioner, supra at 20; and (8) filing of false documents, Stephenson v. Commissioner, 79 T.C. 995, 1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984). Also among the factors which may be considered are the taxpayer's intelligence, education, training, and experience. *491 See Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274; Drobny v. Commissioner, 86 T.C. 1326, 1349 (1986). An understatement of income may be established by an overstatement of deductions. Professional Services v. Commissioner, 79 T.C. at 930. As noted above, respondent made only one adjustment to petitioners' 1987 return. That adjustment was the disallowance of the $ 10,000 rental expense claimed by petitioners as a deduction. The Court has sustained respondent on this issue for the reason that petitioners' property transfers were shams and had no economic effect. This alone, however, does not establish fraud. Respondent agreed, in the stipulation, that the $ 10,000 claimed as a rental expense for the subject properties represented the fair rental value of the properties had the properties been leased in an arm's-length relationship between a lessor and a lessee. To the extent petitioners understated their income by virtue of the claimed rental expense, which exceeded their allowable depreciation, the Court does not consider *492 the underpayment of taxes resulting therefrom as being fraudulent. Petitioners did not conceal their assets. The five properties in question were all identified by street number on Schedule E of petitioners' return. The Court is not convinced that, in the conferences between petitioner and the IRS agent, any information was concealed or that the agent was misled. Petitioner was not as forthcoming as he could have been in presenting documentary evidence or in explaining the property transfers; however, he provided sufficient information by which the agent proceeded through other sources to make his determinations. The Court does not consider as significant that petitioner failed, at his first meeting with the agent, to disclose that he had signatory authority on the Compass-Oxford bank account. The IDR which had been served on petitioner was in general terms, and, prior to the first conference, petitioner was not advised that the focus of the audit would be on the foreign trust transactions. At the conference and thereafter, although in piecemeal fashion, the agent obtained enough information from petitioner from which the agent concluded that the transactions were of no economic *493 effect, and that the additions to tax for fraud would be determined. On the whole, the Court's perception of respondent's position is that there was a suspicion of fraud; however, suspicion alone will not sustain a finding of fraud. Carter v. Commissioner, supra. The Court envisions respondent's position on a parallel with respondent's position in Pauli v. Commissioner, T.C. Memo. 1989-481, where this Court noted: Our reading of this record causes us to conclude that respondent's principal argument is that participation in the ALA/Dahlstrom plan to avoid taxes through the use of domestic and foreign trust organizations was, per se, evidence of fraud. We disagree. See Melvin L. Cochran, D.D.S. Inc. v. Commissioner, T.C. Memo. 1989-102.
On this record, the Court concludes that respondent has not established by clear and convincing evidence that petitioners are liable for the additions to tax for fraud under section 6653(b)(1)(A) and (B) for 1987. Petitioners, therefore, are sustained on this issue. Decision will be entered under *494 Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. There were documents in which Nassau Life resigned as trustee of the foreign entities which held petitioners' property and appointed Oxford Charter Corporation as successor trustee.↩
3. Sec. 167(a) provides generally that there shall be allowed as a depreciation deduction a reasonable allowance for depreciation "(2) of property held for the production of income." Sec. 280A(a) generally disallows a deduction, with certain exceptions, attributable to the use of a dwelling unit which is used by the taxpayer during the taxable year as a "residence". Under sec. 280A(d)↩, the term "use as residence" is defined generally as the use of a dwelling by a taxpayer for personal purposes for a number of days in any year which exceeds the greater of 14 days or 10 percent of the number of days during the year for which the unit was rented at a fair rental.